WEINBERG, et al. *v.* DESSER, et al.

[No. 368, September Term, 1965.]

*Decided July 5, 1966.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*Charles F. Wagaman* and *Elwood E. Hauver,* with whom were *Wagaman, Wagaman, Meyers & Hauver* on the brief, for appellants.

*Joseph L. Nellis* and *David W. Byron,* with whom were *Philipson, Lyon & Chase, Bushong, Byron & Moylan,* and *Dimitri P. Mallios* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

In this action by a real estate broker and salesman to recover commissions claimed to have been earned in connection with the leasing of a motel site, the questions on appeal relate to (i) the sufficiency of the evidence to justify submission of the case to the jury and (ii) the correctness of the instructions to the jury with respect to brokerage commissions. The owners and lessors, Daniel Weinberg and Frederick Innkeepers Corporation, were the defendants below and are the appellants and cross-appellees here. The broker and salesman, Melvin Desser and Armand L. Levinson, respectively, were the plaintiffs below and are the appellees and cross-appellants here.

The plaintiff Levinson and the defendant Weinberg were related and had been friendly for many years. Each frequently visited the home of the other and often discussed their business affairs. Sometime prior to September 1961 they had several conversations regarding the possible development of a twenty-eight acre tract of land located in or near Frederick at West Patrick Street and Baughman's Lane as a site for a motel and other prospective businesses. At the time of these conversations, Weinberg did not own nor did he have an option on the property.

In September of 1961, Levinson telephoned Weinberg and told him that he had found prospective lessees—Adolph and Joel Krisch, then unknown to Weinberg but described to him as successful Holiday Inn operators—and wanted to bring them to Frederick to see the proposed motel site. After Weinberg had been given a complete "run down" on the Krisches and agreed to see them, Levinson rode with the prospects to Frederick, met Weinberg and looked over and discussed the property. No definite agreement was made at that time but it was

agreed that either Weinberg or Levinson was to get in touch with the Krisches at a later date.

In December of 1961, Weinberg secured an option on the property from the owners. Thereafter, between January 1962 and February 1963, Levinson telephoned Weinberg frequently —thirty-four times according to the record Levinson had kept —regarding various aspects of the development of the property and his activities with respect thereto, including contracts with other probable lessees and prospective architects, contractors and mortgagees. Weinberg later communicated with an architect and one or more contractors referred to him by Levinson, and subsequently entered into a contract with one of the contractors to build the motel.

In June of 1962, Weinberg took title to the property which had been rezoned in February 1962. Prior to that date he had informed Levinson that he had received a Holiday Inn franchise. On or about the same time, Weinberg asked Levinson to find a lending institution in Baltimore to match one-half of the necessary funds already committed by a Frederick bank to construct the motel. Levinson, pursuant to the request, got in touch with several persons and mortgage finance companies and Weinberg went to Baltimore to see one of the persons referred to him.

In September of 1962, Weinberg met one of the Krisches in Baltimore (without saying anything to Levinson) to discuss the lease and after several months of further negotiations (conducted for Weinberg by a Washington realtor familiar with motel leasing and a Washington attorney) in which Levinson was not asked to participate, a lease was entered into on February 9, 1963, between the two Krisches and their sister and the corporate defendant, the Frederick Innkeepers Corporation, which had been organized by Weinberg in January 1963 and was wholly owned by Weinberg and his wife. Prior to the execution of the lease, however, Levinson, having found out about the negotiations, wrote Weinberg a letter in which he made his claim for commissions known by saying "if you recall I went with the Krisches to [the] site when you first met them, therefore, I am to be considered the 'procuring agent' in this transaction and expect to be looked upon as same."

At the trial, Weinberg testified that most of what Levinson did with respect to the lease was done "without my knowledge, at his own initiative—not at my direction," but he admitted that he had either "met with the people" Levinson brought to him or "talked with these people" Levinson told him to contact. One of the Krisches also testified that Weinberg "has assured us we have no liability of the commissions—that was his responsibility."

There was other testimony to the effect that while Weinberg and Levinson had discussed other business transactions on a number of occasions over a period of years, the construction and leasing of the motel, being the first to materialize, was the only transaction from which Levinson ever expected a brokerage commission; that Weinberg in September 1962 had offered Levinson a brokerage commission in connection with the development of the whole property; that Levinson was to receive a commission if he secured a tenant for a discount store or super market which Weinberg anticipated constructing at the rear of the property; that Levinson, with the encouragement of Weinberg, undertook to have a portion of the property developed for a nursing home or as an apartment site and toward that end, Levinson obtained approval from the Federal Housing Administration for the apartment; and that Levinson had carried on negotiations with the Krisches both before and after the trip to Frederick as to other possible motel sites in Baltimore.

At the close of all the evidence a ruling on the motion of the defendant for a directed verdict (based on the claim that the evidence was legally insufficient to entitle the plaintiffs to recover) was reserved by the trial court.

The court, after reviewing the facts briefly and instructing the jury as to the law, first, with respect to whether the relationship between Weinberg and Levinson was that of principal and agent or was a gratuitous act of friendship, and second, with respect to whether or not Levinson was the procuring cause of the execution of the lease, further instructed the jury, should it find for the plaintiffs, with respect to the several measures it could consider in determining the brokerage commissions. As to the commissions, the court informed the jury:

"You can, if you desire, adopt a measure of damages along the standards * * * [set forth in the schedule of commissions adopted by the local real estate board]. But you [do not] have to. * * *. You[also] have a right to consider what was the fair and reasonable value of these services. Usually we have a written contract and we know what the fee schedules are going to be. You [do not] have that here. If [you find that a principal and agent] relationship existed, * * * then, it is an implied contract. * * *. Evidence was introduced * * * that * * * the fee schedule * * * is just a minimum schedule, but * * * there * * * [are] circumstances * * * [when] there would be a charge less than * * * the minimum or they would charge more. * * *. [You] can accept that testimony and consider it. But the court further charges you that you are not necessarily bound to it. You have the right in this case * * * to find an amount which you would deem to be [a] fair and reasonable value of the services performed."

The defendants excepted to the instructions for the reasons stated in the motion for a directed verdict and presented here as the basis for their appeal, that is, the refusal of the trial court to instruct the jury that the evidence was legally insufficient to entitle the plaintiffs to recover. The principal reason assigned by the plaintiffs for excepting to the charge, and the only one presented on their cross-appeal, is that the trial court should have instructed the jury (if it found for the plaintiffs on an implied contract) that the plaintiffs had earned and were entitled to customary commissions, that the best and only evidence of "customary commissions" was the schedule of commissions adopted by the local real estate board and that there was (in this case) no difference between such "customary commissions" and the "fair and reasonable value" of the brokerage services the plaintiffs had rendered for the defendants.

The jury, having found a verdict of $21,400 for the plaintiffs, and the motions for a new trial and a judgment *n.o.v.,* having been overruled, a final judgment was entered on the verdict, and the appeal and cross-appeal followed.

(i)

## Sufficiency Of Evidence

This point was raised by the defendants on the appeal. There are two parts to the claim of the defendants that the case should not have been submitted to the jury. The parties are essentially in agreement as to what the law is. The dispute arises in the application of the law to the facts of this case.

Code (1957), Art. 2, § 17, is apposite and provides in pertinent part:

> "Whenever, in the absence of special agreement to the contrary, a real estate broker employed to * * * lease or otherwise negotiate * * * leasehold estates * * * procures in good faith a * * * lessor or lessee * * * as the case may be, and the person so procured is accepted as such by the employer, and enters into a valid, binding and enforceable * * * lease * * * in terms acceptable to the employer, and such contract is accepted by the employer and signed by him, the broker shall be deemed to have earned the customary or agreed commission * * *."

The first contention of the appellants is that since Weinberg and Levinson had not entered into a contract of employment, the latter was not entitled to a commission under the statute. The argument is not valid. While there was no written or express oral contract of employment, none was necessary because an employment relationship, as the cases show, may be implied from the conduct of the parties. See *Sanders v. Devereux,* 231 Md. 224, 189 A. 2d 604 (1963); *Hogan v. Q. T. Corp.,* 230 Md. 69, 185 A. 2d 491 (1962); *Leimbach v. Nicholson,* 219 Md. 440, 149 A. 2d 411 (1959). And although the broker has the burden of proving that he was employed, *Steele v. Seth,* 211 Md. 323, 127 A. 2d 388 (1956), the determination of such a relationship is ordinarily a question of fact for the jury to decide. *Hogan v. Q. T. Corp., supra.* See also *Heslop v. Dieudonne,* 209 Md. 201, 120 A. 2d 669 (1956). In the *Hogan* case, where a real estate broker brought suit for commissions claimed to have been earned in bringing about the lease of a store property, and a question arose as to whether

the owner had employed the broker to lease the store, it was said at p. 75 (of 230 Md.) that "since such relationship [employment] may be implied from the words and conduct of the parties and surrounding circumstances, the question was properly submitted to the jury."

The appellants further argue that Levinson was not the procuring cause of the lease. As was pointed out in *Sanders v. Devereux, supra* (at p. 231 of 231 Md.) and *Steele v. Seth, supra* (at p. 328 of 211 Md.), this is also a necessary element for the recovery of a commission under § 17 of Art. 2. But like the first element concerning the employment, the question as to whether a broker was the procuring cause of a sale, purchase or lease within the meaning of the statute has been before this Court many times.

In *Cowal v. Marietta,* 216 Md. 222, 139 A. 2d 712 (1958), it was said at p. 228:

> "The question of whether a broker's efforts are the procuring cause of a sale is not to be determined by whether his services are slight or extensive but rather on the basis of whether the efforts he did make were in fact the proximate cause of interesting the purchaser, and his ultimate agreement to buy."

And in *Bearman v. Roland Park Realty Co.,* 218 Md. 515, 147 A. 2d 697 (1959), it was said at pp. 518, 519:

> "One satisfies the legal test as to a procurer of the purchaser if the testimony permits the inference that the sale was accomplished as a result of his action in discovering the purchaser, acquainting him with the property and referring him to the seller for further negotiations."

For a later case to the same effect, see *Sanders v. Devereux, supra,* in which many of the earlier cases are cited and discussed.

As with the question of whether the broker was employed within the meaning of § 17 of Art. 2, so also the question of whether the broker was the procuring cause of the lease is ordinarily, as it was here, a question of fact for the jury and not the court.

In the instant case, where it was not disputed that the broker brought the lessees to the lessors for the purpose of looking at the property and discussing its possibilities as a motel site and where there was other credible evidence that the broker, although excluded from further negotiations for the lease, had at the suggestion of the owner participated in other activities in connection with the financing and building of the proposed motel, we think the jury, in considering the evidence as a whole, could have reasonably inferred that Levinson was employed by Weinberg and that his efforts were the procuring cause of the lease. We hold therefore that there was sufficient evidence to justify submission of the case to the jury on the issue of whether the broker was entitled to a commission.

### (ii)

### *Correctness Of Instructions*

This point was raised by the plaintiffs on the cross-appeal. The contention of the plaintiffs seems to be that the trial court erred when it failed to instruct the jury (should it find for the plaintiffs) that they were entitled under the statute to customary commissions based on the standards set forth in the local schedule of commissions and, instead, instructed the jury it should allow commissions based on the fair and reasonable value of the services performed. The argument is that there is no difference between customary commissions and commissions based on quantum meruit. Actually, it appears that the instructions permitted the jury to choose between commissions measured by the schedule and commissions based on the value of the services. We agree, had there been pertinent and relevant testimony to support it, that the jury could have been allowed to base the customary commissions authorized by law on the schedule of commissions, but we do not agree that commissions based on the schedule would in every case be the same as commissions based on quantum meruit.

While the record shows that a member of the local estate board was allowed to testify that the board had adopted a schedule of commissions to be charged in connection with the leasing of real estate and that such charges could by agreement be increased or decreased, the witness was not permitted (on

the objection of the defendants) to testify that the scheduled charges were those that were customarily made for such services.

Regardless of whether the instructions as far as they went were proper or improper, it is clear that the jury was not fully informed as to the law of the case. Since the jury found that brokerage commissions had been earned, the plaintiffs, in the absence of an agreement as to compensation, were entitled to customary commissions or reasonable remuneration. If there is an established custom in the locality with respect to the amount of compensation to which a broker is entitled, the law implies a promise on the part of the employer to pay the usual or customary commissions, and if no such usage or custom can be shown, a broker is entitled to the reasonable value of his services. See 12 Am. Jur. 2d *Brokers* § 161 (1964). To that end, the plaintiffs should have been permitted to introduce evidence to show, if they could, that the schedule of commissions adopted by the local real estate board was the customary charge for the services they had performed for the defendants, and, if there was any proof to that effect, the jury should have been instructed accordingly. See *Mayne v. Eig*, 215 Md. 270, 137 A. 2d 557 (1958). As a precaution, however, the plaintiffs (in addition to showing what they contended were the customary commissions) should also have produced evidence of the fair value of the services rendered. See *Petropoulos v. Lubienski*, 220 Md. 293, 152 A. 2d 801 (1959). This is so because, as indicated above, there is no reason why the jury should not be advised that if it is dissatisfied with the proof of customary commissions, it may award the plaintiffs a fair and reasonable amount as the value of their services. In this case, there having been no proof of either the customary charge or the reasonable value of the services, it is obvious that the jury should not have been permitted to choose between commissions measured by the local schedule and commissions based on the fair and reasonable value of the services performed. And since it is apparent that the instructions were erroneous in part as well as inadequate, there must be a redetermination of the commissions due the plaintiffs. Ascertainment of the amount due may be submitted to the jury on simple issues as to the mea-

sures of damages with appropriate instructions as to the applicable law.

> *Judgment affirmed as to liability and reversed and remanded for further proceedings as to damages; appellants to pay the costs.*