## MARYLAND NATIONAL BANK, TRUSTEE, ET AL. *v*. MERSON, ET AL.

[No. 85, September Term, 1967.]

*Decided April 2, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS and FINAN, JJ., and reargued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES, McWILLIAMS, FINAN and PROCTOR, J., Associate Judge of the Third Judicial District, specially assigned, JJ.

*Russell R. Reno, Jr.,* with whom was *J. Crossan Cooper, Jr.,* on the brief, for appellant Johns Hopkins Hospital.

*Richard F. Cleveland* and *Cleaveland D. Miller,* with whom was *Harry E. Silverwood* on the brief, for appellant Maryland National Bank, Trustee.

Submitted on brief by *Francis X. Gallagher* and *Joseph G. Finnerty, Jr.,* for appellants Lawrence Cardinal Shehan, Roman Catholic Archbishop of Baltimore, and Mercantile-Safe Deposit and Trust Company.

*Martin Beerman* and *Martin Fedder,* with whom was *Michael F. Delea, Jr.,* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

Following a trustee's sale of 2,000 preferred shares in the Baltimore Brick Company which comprised part of the trust corpus, three separate suits were filed in the Circuit Court for Baltimore City. These were consolidated for trial, and it is from the decree of the Circuit Court ordering part of the proceeds from the sale to be paid the life tenants that the trustee and remaindermen have appealed. The appeal raises important issues of proper trust management and the relative duties owed by a trustee to the life tenant and the remainderman.

Frank Novak, by deed of trust (*inter vivos*) dated July 28, 1937, modified by a supplemental agreement of July 10, 1938, conveyed certain property to the Maryland Trust Company, now known as the Maryland National Bank, as trustee. By these instruments income was to be paid to settlor for life, and thereafter, the corpus was to be divided into two equal parts, the income from each half to be paid respectively to Flossie V. Merson and Gertrude F. Herr, now Gertrude F. Rosenthal (appellees). Upon the death of each life tenant, her half of the corpus was to be paid in equal shares to the remaindermen, Johns Hopkins Hospital and the Roman Catholic Archbishop of Baltimore. Included in the assets conveyed by the settlor were 2,000 shares of Baltimore Brick Company non-callable first preferred 5% cumulative stock, par value of $100 per share.

The history of dividend arrearages and payments is most critical to this case, since it reflects the increasing financial stability of the Company from the middle 1950's through 1961, when the shares were sold. The fundamental question in this case, whether the trustee acted with partiality when it sold the stock, must be answered in the context of the soundness of the Company.

When the trust was created in 1937, each share contained a dividend arrearage of $104.25. Between 1937 and October 11, 1945, the date of the settlor's death, only $16.50 in dividends had been declared, and none for 1943, 1944 or 1945. As a result, when each appellee received her 1,000 shares in trust, the accumulated dividend arrearages were $131 per share or $131,000 for each trust. This increased to $143.50 per share in 1951, at which time the Company began the regular annual payments of $5.00 per share. Beginning in 1954, however, the Company also made payments on the arrearages, which arrearages have continued to diminish:

| Year | Dividend Payments (Including $5.00 Annual Payment) | Arrearages |
|------|------------------------------|-----------|
| 1954 | $10.00 | $139.75 |
| 1955 | 10.00 | 134.75 |
| 1956 | 12.50 | 127.25 |
| 1957 | 13.00 | 119.25 |
| 1958 | 22.50 | 101.75 |
| 1959 | 15.75 | 93.00 |
| 1960 | 16.25 | 81.75 |
| 1961 | 36.75 | 50.00 |
| 1962 | 30.00 | 25.00 |

Furthermore, in every year between 1955 and 1960, it was the practice of the Company to pay the dividends on a quarterly basis. Certainly these figures, as well as other evidence in the record, indicate that the Company underwent a marked financial recovery in the 1950's and was experiencing a good earnings record as of 1961. The trust committee of the corporate trustee was well aware of the Company's financial position because one of its members, Mr. Gordon, also sat as a director of the Baltimore Brick Company.

Appellants allege, without evidentiary support, that the trustee had been looking for an opportunity to sell the stock at a reasonable price for almost 24 years. However, when the Company offered to redeem the stock at $85 per share in 1953 when arrearages stood at $143.50, the trust committee rejected the offer "in view of the fact that although the Company had not

reduced the accrued dividends in recent years, it was now paying the regular dividend." (Minutes of trust committee of November 5, 1953). The record also shows that as far back as that date, the trustee recognized the satisfactory operations of the Company, and that the intrinsic value of the stock was greater than $85. There is also evidence that at various meetings of the board of directors of the Company prior to 1961, some concerted but unsuccessful efforts were made to authorize even higher payments on dividend arrearages. Certainly Mr. Gordon realized that the sound position of the Company would be reflected in greater dividend payments to the life tenants.[1]

In 1958 a group of prospective purchasers took an interest in the preferred stock, primarily for the reason that the holder of first preferred 5% cumulative non-callable stock could control the Company by electing six of the nine directors. Before the negotiations eventually broke down, Mr. Gordon sent a memorandum to the president of the bank in which he stated in part:

"Later in the morning, Mr. Flanigan [a representative of the prospective purchaser] called me and I told him that while our Trust Committee was rather reluctant to accept any discount on the stock because *it felt that all of the arrearages would ultimately be paid,* the Committee had finally authorized us to go along at $190 per share." (Emphasis supplied.)

In January of 1961, further offers were made, one by Joseph Mullan, who operated a competing brick company, the other by Baker Watts & Co., which was acting for an undisclosed principal. The trust committee requested Alex. Brown & Sons, a highly respected investment firm, to make a financial analysis of Baltimore Brick Company and determine the fair valuation of the preferred stock.[2] The firm answered on January 25, 1961:

---

1. The evidence showed that the ratio of current assets to current liabilities was 5 to 1 ($1,447,389.45 to $266,494.21), March 1, 1961.

2. In a memo under date of January 6, 1961, Mr. Gordon, chairman of the trust committee of the appellant trustee, indicated his concern that a sale not fall under the criticism of a court, stating: "If any other offer for this stock should be in the wind, we should

"In our judgment the Preferred Stock, exclusive of dividend accumulations, would be fairly valued on a yield basis of 6 percent, or a price of $83.00 per share. Based upon the Company's past dividend record, it is a fair conclusion that dividend arrearages on the Preferred Stock will be paid off over the ensuing years. An optimistic assumption of such period of time would produce a present value of the dividend arrearages of approximately $77.00 per share.

"The sum of the aforementioned figures of $83.00 and $77.00, or an aggregate of $160.00, constitutes our opinion as to the fair market value of the subject shares of Preferred Stock of Baltimore Brick Company."

Shortly after receiving the appraisal, the trustee sold all 2,000 shares to the undisclosed purchaser, which was later ascertained to be the Arundel Corporation, at a price of $162.50 per share, and properly allocated the entire proceeds of $325,000 to corpus.

The record indicates that this sale was made without advance notice of any type given to the life beneficiaries. Afterwards Mr. Gordon sent an office memorandum to other members of the trust committee on February 3, 1961. A portion of this memorandum reads:

"From a legal standpoint, *I should think that you would recognize the advantage of this sale as it relates to the remaindermen of the particular trusts.* That is to say, in normal course the accumulated dividends might have been paid off over a reasonable period of years, thus resulting in diminution of the trust corpus. From the standpoint of the life tenants, it is true that

---

be careful to follow the views outlined by our Court of Appeals in the Hanover Bank Case." He was apparently referring to Webb & Knapp v. Hanover Bank, 214 Md. 230, 133 A. 2d 450 (1957), wherein this Court set aside a sale made by the corporate trustee, of the William Woodward, Jr. farm near Bowie, Maryland, because the sale was made without the corporate trustee first having had an appraisal made of the property by Maryland based appraisers familiar with the local real estate market.

there is a temporary diminution of income; however, once the dividend arrearages had been paid off, the diminution of income would have been even greater. (Emphasis supplied.)

"The only thought that occurs to me is that perhaps we should write to the life tenants expressing to them in a diplomatic way the results of this sale. If you are of the same mind, perhaps you could either prepare letters along the lines which I have indicated, or, on my return from New York, I could sit down with you and we could work the letters out together."

Ten days later, Mr. Gordon sent another memorandum, this time to another officer of the corporate trustee. In part it read:

"I think that the only pending matter, other than the investment of the proceeds of sale in the usual way, is the *consideration* of notice to the income beneficiaries of the various trusts. I have discussed the matter of such notice informally with Mr. Machen. His curbstone opinion that letters to beneficiaries of the two trusts which he represents are not necessary." (Emphasis supplied.)

Each life tenant received an income of $18,450 from the subject trust in 1960. In 1961, appellee Rosenthal received $5,675, and appellee Merson $3,700. It was only through an inquiry prompted by the diminution of income, that the life tenants learned of the sale of the stock.

The corporate trustee and each life tenant filed separate petitions requesting the lower court to determine the proper apportionment of the cash proceeds from the sale. These actions were consolidated on February 19, 1964. After testimony in open court and submission of legal memoranda, the court held that, although the proceeds were properly allocated to trust corpus, the trustee "acted in good faith but erroneously" in selling the preferred stock, and thus deprived the life tenants of substantial income for the sole benefit of the remaindermen. By way of equitable relief, Judge Harris ordered that $77,000, representing the appraised value of dividend arrearages for 1,000 shares, be paid to each life tenant from her half of the corpus,

less any sums earned by the trust which were distributed since the date of the sale. This amounted to a net payment of $59,-939.18 to appellee Rosenthal, and $64,901.58 to appellee Merson. The decree further absolved the trustee from liability to the remaindermen for diminution of the trust estate, since the court found the trustee to have acted in good faith.

Before discussing the legal issues presented it should also be noted that after the memorandum opinion in the court below was handed down, appellants filed a petition for rehearing, in order to offer evidence that appellees were also life income beneficiaries of other trusts established by Frank Novak, and that the total loss of income to appellees has been either minimal or entirely non-existent. Appellants were troubled by Judge Harris' observation in the memorandum opinion that the stock in question comprised 82% of the corpus and produced 83% of the income of the trust. After a hearing and proffer of evidence, Judge Harris, by a separate opinion, denied the petition on the ground that the evidence proffered by the appellants was in their possession at the time of the first hearing, and that appellants were in essence asking for a new hearing. The appeal is also taken from this order.

The appellants contend that the lower court erred in holding that the trustee acted with partiality toward the remainderman by selling the stock, and furthermore, by decreeing an apportionment between life tenants and remaindermen, it circumvented settled Maryland law.

The "Pennsylvania Rule" of apportionment gives the life tenant a portion of the sale proceeds attributable to retained earnings of the corporation. See *Waterhouse's Estate,* 308 Pa. 422, 162 A. 295 (1932) ; *Nirdlinger's Estate,* 290 Pa. 457, 139 A. 200 (1927). That rule is almost totally confined to Pennsylvania, and certainly has never become part of the Maryland law. In *Safe Deposit & Trust Co. v. Bowen,* 188 Md. 482, 53 A. 2d 413 (1947), this Court adopted the rule that an exchange of stock held in trust for other stock pursuant to a corporate recapitalization was essentially a sale, and that proceeds from this sale were applied to corpus. Any increase in the value of the stock resulting from the exchange was considered a capital gain, even if the increase was attributable to retained earnings

of the corporation. See also *Smith v. Hooper,* 95 Md. 16, 51 A. 844, 54 A. 95 (1902).

Contrary to appellants' contention, the lower court correctly applied the Maryland law, holding that *Bowen* was "conclusive of the question raised here. Whether or not the Trustee acted properly in selling the stock, once it was sold the proceeds of the sale were properly allocated to the corpus of the trust." The distinction between *Bowen* and this case lies in the propriety of the trustee's sale, an issue which was never raised in *Bowen.*

Although the proceeds from the sale must become part of the corpus, are we to hold that the life tenant cannot later obtain redress if it is established that the action of the trustee was in derogation of his fiduciary duty? We think not. Certainly where there is evidence of bad faith on the part of the trustee, the life tenant should be able to obtain reparation by taking direct action against the trustee. However, where there has been an action of partiality committed, but no evidence of bad faith, then certainly the courts should consider action which would require the trustee to make a distribution from the corpus to remedy the inequity.

Before resolving the question of what type of equitable relief would be appropriate in the instant case we feel it necessary to discuss further the nature and quality of the action of the trustee in disposing of the stock on February 2, 1961.

We agree with the lower court in its findings that the trustee, while acting in good faith, nevertheless acted with partiality in favor of the remaindermen.

We cannot discount the intent manifest in the memorandum issued by the chairman of the trust committee under date of February 3, 1961, wherein the effect which a sale of the stock would have on the remaindermen appeared to be his primary concern and its effect on the life tenants, a secondary consideration, stating: "* * * I should think that you would recognize the advantage of this sale as it relates to the remaindermen of the particular trusts. * * *." In addition there was evidence that the chairman of the trust committee, Mr. Gordon, as well as the financial analyst who prepared the stock appraisal for

Alex. Brown & Sons, expressed a strong conviction that all of the cumulative dividends, then in arrears, would eventually be paid. The record discloses that the trust officer, Mr. LeRoy Lewis, on cross examination, when presented the hypothetical question of whether a 5 to 1 ratio of current assets over liabilities was good, admitted that he considered a 2 to 1 ratio to be good. The financial statements of the Company introduced as exhibits revealed the Company was conducting a successful manufacturing and sales operation with a well equipped plant. In addition, the real estate which it had acquired for a source of its clay deposits was increasing substantially in value, and as of March 1, 1961, the ratio of current assets to current liabilities was 5 to 1.

The only flaw to which the trustee could point, with regard to the stock as an acceptable security, was its lack of marketability and the absence of diversification in the trust portfolio, due to the fact that 82% of the corpus consisted of Baltimore Brick Company stock. However, it would seem unlikely that these considerations motivated the trustee to make the sale. The facts reveal that the stock was a more attractive investment at the time of the sale than at any time during the sixteen years it had been held in the trust. Furthermore, paragraph 5(a) of the trust agreement specifically authorized the trustee to retain any securities constituting the corpus without liability for any decrease in value.

The quality of the trustee's action with regard to this sale becomes somewhat disturbing from the disclosures in the record which reveal that the marketability of, and desirability for, the stock became obvious, almost simultaneously, to both Mr. Gordon, who served in a dual capacity as a director in Baltimore Brick as well as chairman of the trust committee of the Maryland National Bank, and to Mr. Fisher, who was a director in Baltimore Brick as well as a partner in Baker Watts & Co., the agent for the purchaser of the stock, the Arundel Corporation. In addition, at the time of the consummation of the sale two individuals enjoyed a directorship on the boards of both the Maryland National Bank and the Arundel Corporation.

A further disturbing element is the disclaimer made by Mr. Gordon after the sale in a memorandum addressed to Messrs. Barton and Machen, attorneys representing interested parties:

> "The sale was handled by Messrs. Miles [Chairman of the Board of Maryland National Bank] and Harvey [President of the Bank] under a broad authorization given by our Trust Committee * * *. While I did not personally participate in the matter, in view of the fact that I am still a Director of the Baltimore Brick Company, * * *."

This is a rather esoteric statement, when we consider the obvious reason why Mr. Gordon had been placed on the board of Baltimore Brick Company was because the corporate trustee held a substantial number of Brick Company shares in its trust department and desired a position from which it could obtain first hand knowledge of Baltimore Brick's operations, a reasonable and commendable arrangement. However, it would indeed seem that this was the very time when Mr. Gordon's counsel and judgment would be most valuable to the trustee in reaching a decision so vitally affecting a trust under its administration.

A trustee, with power of sale, must select the proper and, hopefully, propitious time for the sale of securities with an objective analysis of the market to guide him. Intertwining interests are certainly not conducive to providing a climate in which an objective judgment may be exercised. The trustee, with the full knowledge that in the past arrearages in cumulative dividends had been paid to the life tenants, and realizing that the value of the stock held by the trustee was thereby being diminished, in our opinion, favored the remaindermen by disposing of the stock. It should be noted that within four months after the sale a dividend of $33.00 per share was paid, and of this amount, $31.75 consisted of dividends in arrears.

Certainly the approach adopted by the trustee was not in keeping with that which leading authorities and text writers would require of a trustee in such a situation. In *Pennsylvania Company for Insurance on Lives and Granting Annuities v. Gillmore, et al.,* 137 N. J. Eq. 51, 43 A. 2d 667 (1945), the

trustee was presented with an opportunity to dispose of tax exempt government and municipal bonds, held in trust, at a substantial premium. The life tenants and remaindermen both objected to the disposition and the trustee requested enlightenment from the court. The Chancellor instructed the trustee that it had no duty to capture the profit which would result from the sale since by so doing an undue burden would be imposed on the income of the life tenants. The Court quoted from 4 Bogert, *Trusts* § 801 (1st Ed. 1935), which reads:

> "The trustee who holds for successive beneficiaries owes a duty to them to conduct the trust with equal consideration for the interests of all the beneficiaries. He should not unnecessarily show a preference either for the present cestuis or those who are to take income or capital later. * * * 'A trustee has no right to take sides as between the life tenants and remaindermen. If he has an election of taking one of several courses, he must take, if possible, that which will not benefit one at the expense of the other.' "

The Chancellor in *Pennsylvania Company, supra,* further stated:

> "It is the duty of the trustee to return the highest income to the life tenants consistent with the safety of the corpus, and not an income which the trustee may deem to be sufficient for their purposes." 43 A.2d at 672.

Professor Dunham in his treatise, *A Trustee's Dilemma as to Principal-Income,* 98 Trust & Estates 932, 935 (1959) stated:

> "* * * there is no breach of the duty of impartiality if he chooses to continue the situation in which he finds himself and allows the allocation rules to operate in normal course. If, however, he takes affirmative action * * * knowing thereby he will change the allocation rules he is very likely to be in breach of his duty of impartiality."
>
> * * *
>
> "There must be a reason for the sale apart from the

immediate effect on income and corpus to justify a trustee selling in face of knowledge that sale converts probable income into corpus. If the only reason for sale is to avoid an allocation problem or to prevent a windfall to the income beneficiary then it would seem that a trustee is breaching his duty of acting impartially if he sells." *Id.* at 937.

Also, in *McCracken v. Gulick,* 92 N. J. Eq. 214, 112 A. 317 (1920) the Court expressed what we think is the settlor's intent in creating a trust which provides for successive beneficiaries, stating:

"Clearly when he has created a trust fund and directed that the income be paid a beneficiary for life, he intends to secure that income to the life tenant; that is the very object of the fund. * * *. To withhold all dividends would strengthen the corpus of the estate, but the testator can hardly mean to starve the life tenant for the benefit of remaindermen, whom he often has never seen." 112 A. at 317.

We agree with the lower court's finding that the corporate trustee was not acting in bad faith when it sold the stock. We think this finding is supported by the fact that Mr. Gordon was concerned with the ruling of this Court in *Webb & Knapp v. Hanover Bank,* 214 Md. 230, 133 A. 2d 450 (1957), and that he sincerely endeavored to obtain the top dollar for the stock. However, regardless of the presence of good faith, the facts compel us to delineate an appropriate formula for relief to the life tenants from the partiality shown.

We think the lower court, in its effort to remedy the partiality shown by the trustee in favor of the remaindermen, acted with a degree of partiality toward the life tenants. The general principle to be followed in this situation is to place the life tenant, as nearly as possible, in the same position after the sale that he enjoyed prior to the sale. Certainly this should be the objective of a court of equity. However, it is difficult to achieve such a goal without falling into the error of creating some artificial or arbitrary rule. It also should be realized that

a situation with so many variables, as presented by the case at bar, does not lend itself to easy calibration.

The immediate concern of a settlor in establishing a trust with successive beneficiaries, wherein friends or relatives are the life tenants and eleemosynary institutions are remaindermen, is to secure for the life tenant the greatest possible income consistent with sound trust management. With this purpose in mind, tempered by the consideration that one must act without partiality toward either the life tenant or remainderman, we direct our attention to the history of dividend payment of the Baltimore Brick Company.

We note that commencing in 1954, seven years prior to the sale of the stock by the trustees, the Company began paying substantial arrearages in dividends, over and above the regular 5% dividend on the preferred stock. Considering the period embracing 1953, the year prior to the commencement of payment of dividend arrearages, through and including 1960, the year of the last dividend prior to the sale (an eight year period, we find that the average yield per share of stock was $13.125, the life tenants receiving an average annual income of $13,125 from the 1,000 shares in each trust. We again emphasize that there was cogent evidence justifying the conclusion that the entire arrearages of $81.75 per share or $81,750 on the 1,000 shares held in each trust would eventually have been paid in full had the trustee retained the stock. This assumption ceases to be speculative when we consider that within four months after the sale of the stock a dividend of $33.00 per share was paid and the following year, 1962, a dividend of $30 per share was distributed.

Under these circumstances we think the proper way to place the life tenants in the same position after the sale as that enjoyed prior to the sale, is to continue the payment of the average income they had been receiving for the eight year period prior to the sale (the period during which the policy of the Company of paying dividend arrearages became consistent), for such period of time in the future as may be required to pay in full an amount equivalent to the arrearages in dividends.

In reaching this conclusion we are mindful of the fact that the trustee was not required to pay any taxes by way of capital

gains on the $162,500 proceeds from the sale of the 1,000 shares from each trust, the remaindermen qualifying as eleemosynary corporations. This factor should be appreciated by the life tenants, as the corpus which produces their income would have been reduced to the extent of any such tax. Accordingly, the entire $162,500 was added to the corpus of each trust and available for reinvestment purposes.

To enable the trustee to secure for the life tenants a return of $13,125 per year from the reinvestment of the $162,500 in each trust, a yield of 8+% per annum would have to be obtained. Adherence to prudent investment practices renders such a yield unrealistic, however, a 4½% return is not beyond reasonable expectations. This would produce an income of $7,312.50 a year per trust, a sum $5,812.50 less than the average yield of 8+% a year each life tenant had been receiving.

It is at once apparent that an annual yield of $13,125 cannot be realized solely from investment income. We think the equities of the situation can only be resolved by the trustee invading the corpus to the extent necessary to supplement the investment income to enable it to distribute $13,125 annually to the life tenants from the respective trusts, accounting from the date of sale. However, such an invasion of corpus shall not cumulatively exceed the limit of $81,750 per trust, the amount of dividend arrearages on the 1,000 shares held in each trust at the time of sale.

Income from the ground rents and other assets in these trusts, which were not in any way involved in this sale, should be disregarded in making these computations.

We recognize that such a result as herein proposed eliminates the windfall that the lower court gave to the life tenants, which it assumed the life tenants would have received in a comparatively short time, but for the untimely sale of the stock.

However, it should be borne in mind that, although the financial solidity of the Company justified the conclusion that dividends in arrears would eventually be paid in full, had control of the Company passed into the hands of individuals not dividend minded, the shareholders would have had little redress, if any, to compel the continuation of dividend policy.

The record reveals that Mr. Mullan, the owner of a competitive brick company, evinced considerable interest in obtaining control of this company and indicated that if he was successful in so doing he intended to pay out little, if anything, by way of dividends. As contrasted with the foregoing possibility, we have the large dividends which were paid four months after the sale, and again the following year. These were obviously dictated by a desire on the part of the Arundel Corporation to recapture a substantial portion of the purchase price it had paid for the stock and were not likely to have occurred had the destiny of the company followed a normal course.

We are of the opinion that the solution this Court has proposed places the life tenants in as good a position after the sale as they enjoyed prior to the sale.

The appellants also set forth as one of the grounds for this appeal that the lower court erred in refusing to grant their petition for a rehearing. We do not find any merit to this assignment of error. As the lower court succinctly phrased it, this petition was in essence a request for a "new hearing" on the original evidence and not on any new or additional evidence:

> "The evidence which the petitioners now seek to introduce at a rehearing is evidence which was in their possession and within their knowledge during the original hearing—and in fact, had been so for over twenty years."

See *Miller on Equity Procedure,* Section 286.

The main thrust of the appellants' argument in support of their petition was the contention that the lower court failed to take into consideration the fact that there were other trusts created by the settlor in which the life tenants in the instant case were also named as beneficiaries for life. The appellants argued that the court, in ignoring the existence of the other trusts, concluded that the sale of the Brick Company stock resulted in a drastic decrease in income to the life tenants. They contended that when viewed in context with the other trusts, the decrease regarding appellee Rosenthal was only 14% and that appellee Merson did not suffer any decrease in income,

but rather, when the income from all of the trusts in which she was a life tenant was considered, experienced an increase of 2%. We think this is irrelevant.

The record contains ample evidence that the corpus of the two trusts involved in this suit, of which 82% consisted of the Brick Company stock, had for years been considered and administered separately and not in relation to any other trusts. We need go no further than the testimony of Mr. LeRoy Lewis, trust officer for the corporate trustee, who emphasized the lack of diversification in the two trusts here involved, as one of the reasons justifying sale of Baltimore Brick Company stock. It is obvious that he was not looking beyond the portfolio of these trusts when he made the statement and he considered each trust as resting on its own foundation.

We are further of the opinion that since the act of partiality of the trustee forced the life tenants to seek redress in court in order to protect their interest, it is only right that the trustee should be required to pay from the corpus reasonable counsel fees to the attorneys representing the life tenants.

This case is remanded to the lower court in order that it may pass a modified decree in keeping with the guidelines set forth in this opinion.

*Affirmed in part, reversed in part and remanded for the passage of a modified decree consistent with this opinion, appellants to pay reasonable counsel fee of appellees and costs.*