KNOPF T/A Free State Properties *v.* MERCANTILE-
SAFE DEPOSIT & TRUST COMPANY,
Trustee U/W of W. Seton Belt

[No. 11, September Term, 1968.]

*Decided February 6, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS and FINAN, JJ.

*Ronald Willoner,* with whom were *Joseph A. DePaul* and *DePaul & Willoner* on the brief, for appellant.

*C. L. Fossett, Jr.,* with whom were *David A. McNamee* and *Beatty & McNamee* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

This is an action in contract brought by William C. Knopf t/a Free State Properties (appellant), for a real estate commission of $78,455.65 growing out of a sale of a 500 acre farm, known as Oak Hill, in Prince George's County, Maryland. The sale was made to Maryland Community Developers, Inc. by the Mercantile-Safe Deposit and Trust Company (Mercantile), trustee under the will of W. Seton Belt, deceased. Beneficiaries of the trust were the Episcopal Diocese of Washington and St. Barnabas Episcopal Church. The spokesmen for these two beneficiaries were the Hon. Oliver Gasch and the Hon. Ralph Powers. Because of the "off again, on again" nature of the transaction, which extended over a period in excess of five years, it becomes necessary to relate in some detail the moves and counter-moves of the parties.

Maryland Community Developers, Inc., through its president, Albert W. Turner, first became interested in Oak Hill around 1949. However, it was not until after Seton Belt's death in 1959 that Mr. Turner expressed any interest in purchasing the property.

In April of 1961 the appellant became acquainted with the Oak Hill farm and wrote a letter to Mercantile requesting an

exclusive agency for its sale. This request was received by Mr. William G. Frederick (Frederick), a vice-president of Mercantile and was forwarded to Mr. R. P. Hutchins (Hutchins), a real estate officer in Mercantile's real estate department. Mr. Hutchins sent a reply to appellant in which Hutchins indicated that there were legal questions which had to be resolved concerning the Oak Hill property and that appellant would be advised when the farm became available for sale. Appellant was also advised that there would be only an open type of listing of the property and that there would be no exclusive listing. On August 10, 1961, in response to Hutchins' letter, appellant asked if the farm was then available for sale. By letter dated August 28, 1961, Mr. Hutchins again informed appellant that there were legal questions to be resolved and that appellant would be advised when the farm would be on the open market. This ended correspondence until January 3, 1964, when appellant wrote to Mercantile asking for an interview to discuss the possibility of selling the farm. Mr. Hutchins replied for Mercantile on January 6, 1964, stating that:

> "We have no price to quote for this land nor do we plan to actively market it within the near future. If, however, you have any interested parties prepared to make a cash bona fide offer accompanied by a deposit of 10% of their offer, we will be happy to give such an offer consideration."

Appellant replied by letter on January 8, 1964, that he had a client willing to make an offer but that before he would submit the client to Mercantile, appellant desired an agency agreement providing for a 10% commission. Appellant's client was Albert W. Turner. Mr. Hutchins replied on January 9, 1964, for Mercantile that:

> "* * * any property held in the above Estate is not being actively marketed for sale nor do we have *any* intentions of entering into an Agency Agreement for its sale.
>
> If you have anyone interested in the property and are prepared to submit a bona fide cash offer citing all

of the terms as to settlement, commissions, etc., we will be glad to give such an offer consideration and advise you whether it is acceptable or not. Until such time as you can present an offer in this fashion, kindly do not expect us to give any thought or consideration to your inquiries."

Appellant testified that the above statement made him believe that appellee wanted to employ him and that the property was for sale. Shortly after the receipt of the letter of January 9th, the appellant, along with Mr. Dargan, one of appellant's salesmen, met in Baltimore with Mr. Hutchins, the real estate officer of Mercantile, from whom appellant had received most of the correspondence from appellee. There was disputed testimony as to what took place at that meeting; however, on the following day appellant did discuss the property with Mr. Turner. Subsequently, appellant and Mr. Turner met with Mr. Hutchins at Mercantile's office in Baltimore and discussed the possibility of submitting a contract for the purchase of the farm. Shortly thereafter, appellant met with Mr. Turner and his attorney and prepared a contract, dated February 15, 1964, providing for a sales price of $1,800 per acre and 10% commission to appellant. This contract was submitted directly to the Hon. Oliver Gasch, Chancellor of the Diocese of Washington as one of the beneficiaries of the Belt trust. After a discussion between the beneficiaries and Mercantile's officer, Mr. Frederick, the contract was rejected. Appellant was informed of such rejection by letter dated March 4, 1964, from Mr. Hutchins of Mercantile. Mr. Hutchins advised appellant that:

"If your client has any further interest in the property, we will be happy to give such a proposal consideration, however, I must insist that any dealings which you might have in connection with this Estate be directed strictly to this office and not to any other person whom you feel might be interested in the Estate."

Another contract was prepared by appellant providing for a commission of 7% to be paid to him by Mercantile and a sales price of $2,000.00 per acre. This contract was submitted March 9, 1964, and after consideration and discussion between the

beneficiaries and the officers of Mercantile, it too was rejected. Mr. Hutchins again notified appellant of this rejection by letter dated March 24, 1964. Appellant was further advised:

> "If your client has any further interest in the property to the extent of an improvement in price and revision of the mortgage terms as discussed by us, we will be happy to give such further interest our prompt consideration. I might also state that the Trustee is unwilling to pay a commission to a Real Estate Broker in excess of 3% of the gross selling price."

After this rejection, appellant, with Mr. Dargan, his salesman, went to Baltimore and met with Mr. Hutchins to determine what would be required to make the contract acceptable. At this meeting each participant had a copy of the rejected contract and they made notes of the meeting and contract changes in the margins of the rejected contracts. These changes were brought to the attention of Mr. Turner and shortly thereafter appellant and Mr. Turner met in Baltimore with Mr. Hutchins and Mr. Frederick. At this meeting appellant contends they discussed the terms of the contract and that they reached an understanding that $2,500.00 per acre would be an acceptable price. On the other hand, Mr. Frederick contends that at that meeting he advised appellant and Mr. Turner that:

> "* * * the property is not being offered for sale. We have no price for the property, but it is our company policy that if an offer is received, being in a fiduciary relationship—by that I mean handling the property of others—we feel it is our duty to listen to the offer and consider it and give a formal reply. We do that as a matter of courtesy and also as a matter of protection to our trust estates."

Shortly thereafter, appellant submitted another contract dated May 27, 1964, providing for a sales price of $2,500.00 per acre and commissions to be paid by Mercantile to appellant in the amount of 3%.

When appellant's $2,500.00 per acre offer was received, Mr. Frederick met with his superior, Mr. J. K. Brigstocke and it

was decided to take the offer directly to the Trust Executive Committee of Mercantile. On June 2, 1964, the Committee, in reviewing the offer of appellant, stated:

"This Company, as Trustee under the Will of W. Seton Belt, owns several farms in Prince Georges County, Maryland. An unsolicited offer of $2,500. an acre, or $1,452,500., has been received for one of the farms containing about 580 acres and situated about six miles east of the District of Columbia. Mr. Frederick informed the Committee that the Vestry of St. Barnabas Church and the Protestant Episcopal Diocese of Washington, beneficiaries of this trust, have indicated that they feel the time has come to sell these 580 acres. It was the sense of the Committee that the beneficiaries be advised of this offer and that we recommend to them that it be rejected, but, if they still feel the farm should be sold, we recommend that it be offered at public auction in the Fall. It was agreed that, if the beneficiaries request us to accept the present offer, we will do so."

On June 11, 1964, Mercantile officers Messrs. Frederick and Hutchins, met with the representatives of the beneficiaries, Gasch and Powers, to discuss the offer submitted by appellant. It was determined that the offer should be rejected and Messrs. Gasch and Powers informed Mercantile that they leaned strongly toward a sealed bid offering as opposed to a public auction. The participants at this meeting also decided to decline any offers that should be tendered advising the parties submitting the offers that the property would be offered publicly and sealed bids would be received.

By letter dated June 12, 1964, Mr. Hutchins advised appellant that the offer had been declined. This letter concluded by saying: "Consideration is being given to a general offering of the property, and if this is done, you will be notified."

A similar letter was sent to Disc, Inc. who had on June 10, 1964, offered to purchase the property at $2,650.00 per acre with terms or $2,500.00 per acre cash.

The appellant after receiving their letter called Mr. Hutch-

ins, who told appellant that Mercantile was going to sell the property on a bid basis, and that appellant would be informed when a brochure was available so that appellant could pass the information on to Mr. Turner. The appellant called Mercantile periodically and was informed that they were in the process of preparing the proposal for the sale of the property.

Mr. Frederick prepared the brochure soliciting offers to purchase the property. The brochure provided in part that:

"The bid price shall be net to the Trustee. At the time of executing a Contract of Sale, an indemnity satisfactory to the Trustee shall be executed by the purchaser in which the purchaser shall agree to save the Trustee harmless of all costs, liability and expense (including reasonable counsel fees) arising out of any claim for real estate brokerage commissions or other compensation allegedly payable to any real estate broker or other persons as compensation for bringing about the sale to the purchaser.

"This solicitation shall not be construed as employment of any real estate broker by the Trustee. Any real estate broker to whom this solicitation may be sent or who is or may become involved in a sale of the property by reason of this solicitation shall look solely to the purchaser and not to the Trustee for any compensation to which any such real estate broker may become entitled."

Mercantile sent out 1,242 flyers on the property and advertised it a total of twenty-seven times in ten newspapers in New York, Philadelphia, Baltimore and surrounding areas. As a result of the advertising campaign, Mercantile sent out 284 solicitations of offers to persons who requested them.

On March 12, 1965, the appellant received the brochure and a printed form letter from Mercantile. The letter provided:

"You will note from Page 3 of this Solicitation that the bid price shall be net to the Trustee, and that the Solicitation shall not be construed as employment of any real estate broker by the Trustee."

Upon the receipt of the brochure and the letter, the appellant immediately called Mr. Frederick and told him that if the property were sold to Mr. Turner, a commission was due appellant from Mercantile.

Altogether seven bids were received and they were opened on April 26, 1965. Maryland Community Developers, of which Mr. Turner was president, was the highest bidder. Mr. Turner had submitted two bids for the property, one for $3,755.00 per acre submitted through Carrollton Enterprises, Inc., one of Turner's corporations and another for $4,550.00 submitted though Maryland Community Developers, Inc., also a Turner corporation. He had prepared yet another bid for $5,100.00 per acre which he did not tender. The two bids submitted by Turner were high, the nearest bid to them being $2,110.00 per acre. Mercantile accepted the Turner bid of $4,550.00 per acre and on May 20, 1965 he signed the purchase contract, together with a separate agreement to indemnify the defendant from claims for commissions emanating from any real estate broker. Settlement was consummated on November 22, 1966.

On March 29, 1967, the appellant filed suit in the Circuit Court for Prince George's County, Maryland to recover the real estate broker's commissions he felt were due from Mercantile. The appellant's theory was that he had procured the purchaser for Mercantile by virtue of an agency agreement which, as stated in appellant's answer to demand for particulars, "evolved on or about January 12, 1964 and repeated until the spring of 1965", and was "both written and oral." He felt that after he had interested the prospective purchaser, Mr. Turner, in the property and had procured him as a purchaser, Mercantile advertised the property in local newspapers offering it for sale under sealed bids as a subterfuge to avoid his commission.

The case was tried before a jury with Judge Perry G. Bowen, Jr. presiding. At the close of appellant's case, Mercantile moved for a directed verdict which was denied. Mercantile then proceeded with its case, at the close of which it again moved for a directed verdict, which was denied and the case was submitted to the jury which returned a verdict of $78,455.65 in favor of the appellant.

Mercantile thereupon filed a motion for a judgment *n.o.v.*, alleging there was no legally sufficient evidence on which the question of employment of the appellant could have been submitted to the jury, and that any employment that may have existed between the appellant and Mercantile was expressly terminated and that there was no legally sufficient evidence of bad faith by Mercantile in its termination of the agency for consideration by the jury. On hearing the motion, the court in a *written opinion, ordered that a judgment n.o.v. be entered in favor of Mercantile.*

The court below held, (1) that there was no legally sufficient evidence from which the jury could have found that Mercantile employed the appellant to sell the property; and (2) that there were no facts sufficient to support a finding of bad faith on the part of Mercantile and that the invitation to bid had the legal effect of terminating any previous employment of the appellant, had any such employment existed. It is from the judgment *n.o.v.* that this appeal is taken.

The appellant contends that, (1) there was evidence from which a jury could find that the appellant was employed by Mercantile; and (2) that the court below erred in finding as a matter of law that there was a good faith termination of the appellant's employment before he had procured a purchaser ready, willing and able to purchase the property.

We shall address ourselves to what we consider to be the controlling issue in this case, namely, was the advertising for sealed bids by Mercantile a valid termination of any agreement which may have existed between it and the appellant for the payment of commissions.

The law of Maryland has gone far in recognizing that if the broker produces any evidence tending to prove an agency, created by the express language of the parties, oral or written, or implied from their conduct, the question of its existence becomes a matter for determination by the jury. *Weinberg v. Desser,* 243 Md. 347, 221 A. 2d 66 (1966) ; *Sanders v. Devereux,* 231 Md. 224, 189 A. 2d 604 (1963) ; *Hogan v. Q. T. Corporation,* 230 Md. 69, 185 A. 2d 491 (1962) ; *Heslop v. Dieudonne,* 209 Md. 201, 120 A. 2d 669 (1956) ; *Steele v. Seth,*

211 Md. 323, 127 A. 2d 388 (1956); *Heise & Burns v. Gold-man,* 125 Md. 554, 94 A. 159 (1915).

The appellant relies heavily on *Weinberg, supra; Hogan, supra* and *Heslop, supra.* However, it should be noted that none of these cases has the fiduciary overtones present in the instant case which required Mercantile, as trustee, to keep itself fully informed and listen to proposals which may have eventually inured to the benefit of the beneficiaries. *Restatement of Trusts* (Second) Explanatory Notes § 231, comment b.

It is not our intent here to concern ourselves with a further analysis of the negotiations between the appellant and Mercantile for it matters naught whether the unsolicited overtures of the appellant eventually acquired an agency status or at best cast him in the role of an aggressively interested volunteer. For the purposes of this opinion, we assume, without deciding, that an agency relationship came into being only to be validly terminated by Mercantile before the appellant produced a buyer who was ready, willing and able to purchase on terms acceptable to Mercantile.

The crucial phase of this transaction occurred when Mercantile received the third offer from Maryland Community Developers, Inc., of $2,500.00 per acre on May 27, 1964. At that time, Mr. Frederick, a vice-president of Mercantile conferred with his superior, Mr. Brigstocke, both of whom in turn submitted the offer to the Trust Executive Committee of Mercantile. The Committee deemed it best to enlighten the beneficiaries of this latest offer which was done at a meeting held June 11, 1964, as a result of which it was the consensus that the offer be rejected and that public solicitation for sealed bids be vigorously pursued. The appellant was forthwith notified on May 27, 1964, of the rejection of the offer and was informed, as was Disc, Inc., which had also submitted an offer of $2,500.00 per acre, that a general offering was contemplated.

A widespread solicitation for bids ensued with utilization of the mails for flyers and brochures and the employment of newspaper advertising. The language in the brochure, which has, in part, already been set forth in this opinion, was clear and unequivocal as to the fact that Mercantile did not intend to pay any brokerage commissions attendant to the sale. It is obvious

that the appellant so interpreted the language of the brochure and that it amounted to a termination of any agency because, immediately upon his receipt of the brochure on March 12, 1965, he contacted Mercantile by telephone, lodging a strong complaint against the course of action it had taken and threatening litigation to obtain his commission, if Turner eventually proved to be the successful bidder. We emphasize, that as of this time the appellant's prospect (Turner) had never tendered an offer which was acceptable to Mercantile. We think that the rejection of all existing offers and the public solicitation of sealed bids expressly terminated any agency which may have existed until that moment.

In *Partello v. Hagan Realty,* 246 Md. 14, 18, 226 A. 2d 896 (1967) this Court cited *Hill v. Iglehart,* 145 Md. 537, 125 A. 843 (1924) as enunciating the principle of law applicable to the revocation of a brokerage contract such as we have in the case at bar, adopting the language of Judge Offutt, who writing for the court said:

> "The general rule is that the principal may at any time, before the broker finds a purchaser ready, able and willing to buy the property upon terms satisfactory to the principal, revoke the agency, 9 C.J. 563, and that where such revocation is untainted by fraud or bad faith, the broker will not be entitled to commissions even though the principal after the revocation sells the property to a purchaser with whom the broker had been negotiating, and notwithstanding that the broker's efforts may have been the direct and procuring cause of such sale. *Howard v. Street,* 125 Md. 302; *Attrill v. Patterson,* 58 Md. 226; *Beale v. Creswell,* 3 Md. 201." 145 Md. 537 at 550.

See also *Leimbach v. Nicholson,* 219 Md. 440, 149 A. 2d 411 (1959) ; *Steele v. Seth,* 211 Md. 323, 127 A. 2d 388 (1956). Cf. *Cloney v. Pistorio,* 251 Md. 511, 248 A. 2d 94 (1968).

We think the only question remaining to be answered in this case is, whether or not the termination of any agency that may have existed was in good faith. In answering this question it is necessary that we keep in mind the fiduciary capacity in

which Mercantile was serving. As trustee for the Episcopal Diocese and St. Barnabas Episcopal Church, Mercantile was under compulsion to proceed with a greater degree of care and caution than if it were the owner of both the legal and equitable title to the property. The liability for reimbursement to the beneficiaries incurred by a trustee who disposes of trust property for a value less than he should have received is clearly set forth in the *Restatement of the Law of Trusts,* (Second) § 205, comment d. Mercantile's concern with this responsibility is clearly cognizable from its decision to consult with the beneficiaries as to the best manner in which to proceed in disposing of the property. Mercantile undoubtedly concluded that a public solicitation for bids offered the best protection for the interests of the beneficiaries as well as itself. Although this method of procedure resulted in the rejection of all existing offers and the termination of any existing agency relationships, Mercantile's motives cannot therefore be impugned, nor can the appellant fault it for the precautions taken. (As to the burden imposed by law on one who acts in a fiduciary capacity to proceed with caution, see *Maryland Nat'l Bank v. Merson,* 249 Md. 353, 239 A. 2d 905 (1968) and *Webb & Knapp v. Hanover Bank,* 214 Md. 230, 133 A. 2d 450 (1957).)

We would be reading something into the facts which does not exist and which is not consonant with the law controlling the actions of a fiduciary in such a transaction, to give credence to the appellant's theory, based on pure conjecture, that the device of public solicitations for sealed bids was a subterfuge, to which Mercantile resorted, to circumvent an obligation which it may otherwise have incurred, to pay him commissions on the sale.

The appellant argues that the inclusion in the brochure of the requirement that the successful purchaser execute an indemnity agreement saving harmless Mercantile from any obligation to pay brokers' commissions is evidence of bad faith. Again, we cannot debase the fact that Mercantile was serving in a fiduciary capacity and had a duty to protect the trust. The *Restatement of Trusts,* (Second) § 178, imposes upon the trustee the "duty to the beneficiary to defend actions which may result in a loss to the trust estate, * * *." *A fortiori,* the trustee can-

not be penalized for taking precautions to head off possible litigation. The real estate officer of Mercantile testified that since 1960 they had had various unsolicited offers for the purchase of the property and there was evidence that some 46 persons had made inquiry about the property before it was publicly advertised for sale. The property was advertised 27 times in some ten metropolitan newspapers in New York, Philadelphia, Baltimore and Washington. Once public solicitation for bids was agreed upon, as the method of disposal, the indemnity agreement was no more than what prudence would dictate.

Judge Bowen, in the lower court, held that there was no evidence of fraud or bad faith for the jury to consider and with this holding we agree.

In *Safeway Stores v. Bolton,* 229 Md. 321, 182 A. 2d 828 (1962), we said:

"* * * It is well established that a jury should consider only the evidence before it in deciding a particular question and should not be allowed merely to speculate; and where the evidence is not sufficient to support a jury's verdict on a particular question, that question should not be submitted to it. *Maszczenski v. Myers,* 212 Md. 346, 129 A. 2d 109 (1957); *Baer Brothers, Inc. v. Keller,* 208 Md. 556, 119 A. 2d 410 (1956). * * *." *Id.* at 328.

For the reasons stated we affirm the lower court's granting judgment n.o.v. in favor of the defendant.

*Judgment affirmed, with costs.*