MAYNE ET AL. *v.* EIG ET AL., ETC.

[No. 73, September Term, 1957.]

272

*Decided January 17, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND and HORNEY, JJ.

*Hyman Ginsberg,* with whom were *William B. Wheeler* and *Ginsberg & Ginsberg* on the brief, for appellants.

*William A. Linthicum, Jr.,* and *Plummer M. Shearin,* with whom were *Bradshaw, Shearin, Redding & Thomas* on the brief, for appellees.

BRUNE, C. J., delivered the opinion of the Court.

This is a suit by real estate brokers for commissions on the sale of a tract of land and the improvements thereon. The sellers denied liability for any commissions. The case was tried in the Circuit Court for Montgomery County before Judge Reeves and a jury, and resulted in a verdict in favor of the brokers for $10,000 and judgment thereon, from which the sellers appeal.

The two principal questions presented at the trial were, first, whether or not there was a special agreement between the sellers and the brokers that there would be no commissions payable to the brokers if the net amount received by the sellers did not exceed·$200,000, and second, whether or not the brokers had acted in good faith or were representing the purchaser, rather than the sellers of the tract. A third question, which is essentially a variant of the second, was and is whether or not the brokers were representing both parties, without the knowledge of the sellers that they were so doing. The second and third questions will be treated together. A fourth question relates to the measure of damages and evidence relating thereto.

The sellers, defendants below and appellants here, are Mehrl L. Mayne and ·his wife and their two sons Edward F. Mayne and Mehrl F. Mayne and their respective wives. They owned a tract of about 204 acres of land and the improvements thereon at or near the intersection of Shady Grove Road and U. S. Route 240 in Montgomery County, which they operated as a farm. James W. Kibbie, a real estate salesman, on June 12, 1955, entered the employ of Eig & McKeever, the plaintiffs below and appellees here, who were licensed real estate brokers. Kibbie was a friend of one of the younger Maynes. The latter told Kibbie in June, 1955, that his family was interested in selling the farm and asked· Kibbie to visit the farm, look it over and sell it, if he could. After visiting and inspecting the farm and conferring with Mehrl L. Mayne and Mehrl F. Mayne, Kibbie reported on the matter to John E. McKeever, one of the members of the firm of Eig & McKeever, and the farm was then shown

to Mr. Sam Eig. The latter is the father of Lawrence Eig, who is the other partner in the firm of Eig & McKeever.

During the negotiations which followed Kibbie sought unsuccessfully to obtain an exclusive sales listing of the Mayne farm, and the Maynes stated that their price was $200,000 net. There was a conflict in testimony as to whether or not Kibbie had agreed to accept a net listing or had told Edward Mayne that Eig & McKeever would expect a commission of 5% on the sales price and could not accept net listings because they were illegal and unethical. Edward F. Mayne, one of the defendants, who became a real estate salesman after the contract for the sale of the farm was signed, conceded at the trial that Kibbie could not have accepted a net price contract, but denied knowledge of this at the time of the negotiations.[1]

Sam Eig made one or two offers of a less amount than $200,000, which the sellers rejected. At a conference in Sam Eig's office on July 7, 1955, he made an offer of $200,000, which was orally accepted by the Maynes. One of them then stated that this figure was to be the net amount which the sellers were to receive. Sam Eig said that any dispute over commissions was a matter between the sellers and the brokers. No agreement was reached on that subject during the conference. McKeever, who was one of the participants in the conference, drafted a contract of sale dated July 7, 1955, the "date of acceptance" of which is stated as July 8, 1955. It was signed by Sam Eig as purchaser and by all six of the Maynes as sellers.

This contract provided, among other things: that the sale price was to be $200,000, of which $5,000 was paid as a deposit; that $60,000 (including the $5,000 deposit) was to be paid at the date of conveyance; that the balance of $140,000

1. See Code (1951), Art. 56, Sec. 231 (o), as amended by Ch. 631 of the Acts of 1955, effective June 1, 1955, which authorizes the Real Estate Commission of Maryland to suspend or revoke the license of a salesman or broker for "the acceptance of any * * * listing contract which provides for a 'net' return to the vendor, leaving the licensee free to sell the property at any price he can obtain in excess of the 'net' price named by the vendor."

should be secured by a first deed of trust on the premises and should be payable in instalments over a period of 48 months, with interest at 4%, and that the purchaser might pay off the entire balance at any time; that settlement should take place on or before April 15, 1956; that the property should be conveyed "to Sam Eig or his designees or assigns;" that at the request of the purchaser any 30 acres in the tract should be released from the lien of the purchase money deed of trust and that additional land should be released on payment of $2,000 per acre. The only other provision of the contract calling for special note is this paragraph contained in the printed portion thereof: "Agency. The Sellers recognize EIG & McKEEVER as the agent negotiating this Contract and agree to pay ...... commission for services rendered, same to be due and payable upon signing of this Contract. The entire deposit shall be held by the Agent until settlement hereunder is made and the party making settlement is hereby authorized and directed to deduct the aforesaid commission from the proceeds of sale and pay same to said Agent. If the sale is not closed because of the Purchaser's default the commission shall not exceed the amount of the deposit."

There was testimony to the effect that McKeever discussed commissions with Edward F. Mayne when the contract was presented to the latter for signature on July 8th, but that no agreement was reached.

Sam Eig designated Silver Spring Shopping Center, Inc., a corporation controlled by him, as the party to which the tract was to be conveyed. There was a conveyance of one part of the tract consisting of about three and one-half acres in October, 1955. No question of commissions came up at that settlement. It took place in the office of Mr. Wheeler, counsel for the Maynes. Sam Eig did not attend. McKeever brought over Eig's check and probably signed a copy of the settlement sheet for him. He stated that his action in bringing over the check was a courtesy to the purchaser.

The brokers did not at any time seek to enforce collection of their commissions out of the deposit which they received in July, 1955. They deposited this check in their trust ac-

count. McKeever testified that it was the custom of his firm to turn such deposits over to the title company [handling the settlement], that he did not approve of holding the deposit as part of the commission and that he felt it better to have his firm's commission come from the title company or the sellers.

The major and final settlement under the contract was held on April 12, 1956, at the offices of a law firm in Washington, which apparently represented a title company. A representative of this firm was present at the settlement and produced a settlement sheet which showed as one item a commission of $10,000 to Eig & McKeever. Others present at the settlement were Kibbie and McKeever, Mr. Shearin, as counsel for Sam Eig, all three of the Messrs. Mayne and their counsel, Mr. Wheeler. After the settlement sheet was produced, the meeting broke up temporarily in disagreement over the commissions. The Maynes refused to agree to pay any commissions. Then Mr. Shearin, on behalf of Mr. Sam Eig, demanded that the contract of sale be fulfilled, regardless of any dispute over the commissions. There is some conflict or confusion as to the order of departure of the disputants. The brokers insisted upon their right to commissions and attempted to hand a bill for commissions to the Maynes, but the Maynes denied any obligation to pay commissions, refused to accept the bill, and then walked out of the meeting. Apparently they returned later, and the settlement was consummated on the same day, with the item for commissions deleted from the settlement sheet. Neither McKeever nor Kibbie was then present. This suit followed several months later.

In his instructions to the jury Judge Reeves read to them the following pertinent portion of Code (1951), Art. 2, Sec. 17: "Whenever, in the absence of special agreement to the contrary, a real estate broker employed to sell, buy, lease or otherwise negotiate real or leasehold estates * * * procures in good faith a purchaser * * * and the person so procured is accepted as such by the employer, and enters into a valid, binding and enforceable written contract of sale * * * in terms acceptable to the employer, and such contract is ac-

cepted by the employer and signed by him, the broker shall be deemed to have earned the customary or agreed commission, as the case may be, * * *." He next instructed them that they should "first consider whether there was any special agreement that no commission was to be paid", referred to testimony as to the listing of the property with Kibbie for sale at $200,000, net, and to the defendants' testimony that they had no agreement *not* to pay a commission, and added that: "It is for you to say whether on all the evidence in this case the listing to sell at two hundred thousand dollars net constituted such an agreement between the plaintiffs and the defendants as would make this an agreement on the part of the plaintiffs to procure a sale of the property without commission."

This was followed by a paragraph dealing with the employment of the brokers by the sellers and their production of a purchaser acceptable to the sellers. The court continued with this paragraph: "It is also the law that in order to recover a commission a broker must procure a purchaser at the price specified by the seller, unless the owner consents to a sale for a sum other than the price originally agreed upon. The mere fact that there was a listing for two hundred thousand dollars net to the sellers would not deprive the plaintiffs of their right to a commission, if the sellers at any time in the course of their dealings decided to sell to the purchaser produced by the plaintiffs at a price more or less than the two hundred thousand dollars, unless the real estate broker and the sellers agreed that no commission was to be paid. It is further a general rule of law that if the broker introduced the seller and the purchaser and such introduction is the foundation upon which negotiations were begun and the sale effected, he will be entitled to commissions, even though the price ultimately agreed upon by the seller and the purchaser may be lower than the price at which the broker was authorized to sell. In this case there seems to be no doubt but that the seller and the purchaser were brought together by the plaintiffs, and that the purchaser introduced by the plaintiffs did ultimately buy the property."

Next the Judge stated the two principal defenses which we

have referred to at the outset of this opinion. The first of these was that the listing of the property at $200,000 net constituted a special agreement between the brokers and the sellers that there would be no commission payable. He also stated the brokers' contention on this branch of the case that they had done what they were employed to do and that when the sellers agreed to accept a price of $200,000, they (the brokers) had earned their commission in the absence of a special agreement not to pay a commission.

In their brief the appellants set forth a total of fourteen questions under the heading "Questions in Controversy". Three of them (Nos. 1, 2 and 3) clearly relate to those portions of the instructions to which we have just referred. Not one of these three is supported by any objection to the charge, such as is required under Rule 554 d of the Maryland Rules. Hence, under Rule 554 e, none of these questions is properly before us. *Belt's Wharf Warehouses, Inc. v. International Products Corp.*, 213 Md. 585, 132 A. 2d 588. We may note in passing that the defendants' claim that under their agreement with the plaintiffs, no commissions would be payable unless the defendants realized at least $200,000 net was squarely presented to the jury, and that their question No. 3 seems to misconstrue the court's construction of Sec. 17 of Art. 2 of the Code (1951). Since these first three questions are not properly before us, it would be useless to review the many cases in this Court, such, for example, as *Jones v. Adler,* 34 Md. 440, or *Heslop v. Dieudonne,* 209 Md. 201, 120 A. 2d 669, which have dealt with the right of a real estate broker to commissions where the broker is the procuring cause of a sale, but the price ultimately accepted by the owner is less than that originally authorized.

The following five questions or contentions included in the appellants' list of fourteen questions are also not supported by objections to the charge as required by Rule 554 d, *supra,* and under Rule 554 e, *supra,* are not properly before us: No. 5, which challenges the alleged omission from the instruction with regard to damages of any reference to the defendants' claim that they were to receive $200,000 net; No. 6, complaining that the words "bona fide" [which were not

actually used by the court; "good faith" was the term employed] were not sufficiently explained to the jury; No. 7, which contends that the construction of the statute relating to commissions was left to the jury; and Nos. 8 and 9, which deal with alleged waiver. We shall not discuss these further.

The remaining six questions or contentions relate to two matters: one, the loyalty of the brokers to the sellers in effecting the sale, and the other, the amount of damages.

With regard to the former, the evidence shows, as we have stated, that Lawrence Eig, of Eig & McKeever, is a son of Sam Eig. It also shows that Lawrence Eig was an officer of the Silver Spring Shopping Center, Inc. and that, as its Assistant Secretary, he attested the deed of trust executed pursuant to the contract of sale. He also signed checks payable to the defendants as President of the Shopping Center Corporation, but the evidence is that he did not hold that office. Sam Eig executed the deed of trust as President. There was also the evidence above mentioned that McKeever took a check or checks to the first settlement for Sam Eig, and there was testimony that Sam Eig was a customer or client of Eig & McKeever. The father and son relationship between Sam Eig and Lawrence Eig was well known to the Messrs. Mayne for many years.

The sellers made a considerable effort during the trial to show that the brokers were acting for the purchaser during the negotiations, and not for the sellers. In addition to stressing certain of the facts just mentioned, the sellers emphasized the clause in the contract which provided for the release of any 30 acres from the deed of trust and the fact that Sam Eig selected the 30 acres which contained all of the improvements, a small lake and very desirable frontage on Shady Grove Road.

The sellers also requested an instruction to the effect that if the brokers were representing both sides, without the knowledge of the sellers, they would not be entitled to recover. The trial judge refused to give this latter instruction because he thought that there was no evidence to support it. In this we think he was right. McKeever and Kibbie asserted that they were representing the Maynes and denied

that they were representing Sam Eig in the sale. The chief evidence supporting the view that they were in fact representing Sam Eig was an inference which might be drawn from the relationship between Sam Eig and Lawrence Eig, and we think that that relationship was well known to the Maynes, and there does not seem to have been any evidence of concealment. The clause containing the option to Sam Eig to obtain the release of any 30 acres from the deed of trust was clearly expressed. The provisions as to deferred payments were inserted in accordance with the desire of the Maynes and the advice of Mr. Eig's tax consultant, which Mr. Eig obtained for the Maynes without expense to them and with their approval, if not gratitude. Eig had offered them a cash settlement, but the Maynes preferred instalment payments. Insofar as the terms of the contract are concerned, McKeever's testimony was that he drafted the clauses now under attack on the basis of notes which he made during the conference of July 7, 1955, between Sam Eig and the Maynes, and that he did not participate in the discussion which led up to the agreement on these clauses. The terms relating to deferred payments, he said, were dictated by two of the Maynes.

The issue actually pressed at the trial—whether the brokers really represented the Maynes or really represented Sam Eig—was submitted to the jury by the following instructions: "The second major defense presented by the defendants is that the plaintiffs were not acting in good faith, in that they were representing Mr. Sam Eig and not representing the plaintiffs. The Court instructs you that the mere fact that Mr. Sam Eig, the purchaser, was the father of one of the plaintiffs, and the mere fact that one of the plaintiffs was also an officer of the corporation which the contract purchaser designated as the ultimate title holder to the property, do not of themselves constitute bad faith, but you may consider these circumstances in connection with all of the other evidence in the case, in determining whether the salesman, Mr. Kibbie, and the brokers, the plaintiffs in this case, acted in good faith in the handling of the transaction; performed their services as brokers and procured the

purchaser who was accepted by the defendants, and earned their commission.

"If you find that the plaintiffs in this case were in fact representing the purchaser and not the sellers, then of course, they would not be entitled to receive any commission from the sellers, but if you find that they were employed by the sellers, acted as real estate brokers and produced a purchaser ready, willing and able to buy and that the contract was accepted by the sellers, then you will find for the plaintiffs, provided, of course, that you find that they were acting in good faith."

At the request of the plaintiffs and after the defendants' request for an instruction based upon dual agency, without the knowledge of the sellers, had been denied, the trial judge gave a further instruction, to which the defendants duly objected, to the effect that once the sale had been consummated and the contract of sale signed, there was no limitation upon the right of the broker thereafter to go out and represent any party that he wished, so long as he did not hinder, delay or interfere with the sale which had already been consummated and the contract which had already been signed between the purchaser and the seller whom he had brought together. This instruction was requested because of the evidence that McKeever had acted for Sam Eig at a settlement. It would also bear upon Lawrence Eig's attestation of the purchase money deed of trust and his signing checks as an officer of Silver Spring Shopping Center, Inc. We think this instruction was proper. It relates only to actions subsequent to the signing of the contract. It embodies substantially the language of the proviso at the end of Sec. 17 of Art. 2 of the Code (1951), which denies the right of a broker to commissions if he prevents, hinders or delays performance of the contract; and it is in accord with *Owners' Realty Co. v. Cook,* 123 Md. 1, 90 A. 602. In that case the broker was a lawyer and the purchaser whom he produced was his father. The contract of sale was drawn by the sellers' counsel and was duly executed by both parties. Prior to its execution the contract was examined by the broker, as counsel for his father, to ascertain that the terms agreed upon were cor-

rectly expressed; and after the execution of the contract the title was examined by the broker, as counsel for his father, the purchaser. He raised several questions which did not appear to have been unreasonable or to have been pressed with a view to avoiding the sale. The general rule against an agent acting for both parties was recognized, but was found inapplicable because of the successive, rather than simultaneous, representation of the seller and of the purchaser, and the broker was held entitled to his commission. The case arose before the enactment of Sec. 17 of Art. 2 of the Code, *supra,* and was decided without reference to the provisions of that statute.

We think that the original instruction given by the trial judge on the issue of loyalty, which we have quoted above in full, submitted fairly to the jury the real issue of loyalty presented by the evidence in this case, which was simply, which master did the brokers serve? We do not think that this issue was submitted in a misleading way, as the appellants contend; and we, accordingly, do not find any basis for reversing the judgment so that this issue might be retried.

On the issue of damages, little need be said. The defendants object to the admission of testimony by one experienced real estate broker to show that the customary commission on sales of real estate similar to that of the defendants, located in Montgomery County, was 5%. There was similar testimony of another broker, to which no objection was made. See *Salvatorian Mission House, Inc. v. Horn,* 210 Md. 475, 124 A. 2d 268. This suit is on a *quantum meruit* basis. The statute (Code, Art. 2, Sec. 17, *supra*) provides for "the customary or agreed commission", and this testimony relates directly to the customary commissions. The defendants' objection seems to be based upon the theory that there was an agreement that there should be no commission unless they realized $200,000 net, and that this agreement precluded the admission of evidence as to customary commissions. The alleged agreement upon a net price has already been fully discussed, and that discussion will not be repeated here. This theory presupposes an agreement which the jury did not find

to exist, and we find no force in the defendants' objection based on this ground. .

The defendants also object to the trial judge's instruction with regard to the amount of the verdict which the jury might find for the plaintiffs, on the ground that it stressed the testimony that the customary commissions on sales of property in Montgomery County were 5%. The trial judge referred to the statutory provision which we have just mentioned with regard to the customary or agreed commission, and pointed out that the only testimony on the amount of the commission was that of the brokers that the customary commission was 5%, or $10,000. The Judge prefaced his charge on the question of damages with the clause, "if you find for the plaintiff". He closed with the statement: "It will be for you to determine, on the evidence, whether the plaintiff is entitled to recover anything, and, if so, what amount." We find no error in the instruction as given. If the jury had found for the defendants on the issue of the alleged agreement to sell at a net figure, the plaintiffs would not have been "entitled to recover anything." Since the jury evidently did not find such an agreement, there is no reason why it should not have considered the evidence as to the customary commission.

As a matter of completeness, we may point out that the defendants moved for a directed verdict at the close of the plaintiffs' case, that this motion was denied and that it was not renewed at the end of the entire case. On the contrary, the plaintiffs then moved for a directed verdict in their favor. This motion was overruled by Judge Reeves because he thought there was sufficient evidence in the case to require its submission to the jury on the question of whether or not there was a special agreement under which the price had to exceed $200,000 before the plaintiffs would be entitled to any commission, and on the question of whether the plaintiffs were ultimately representing Sam Eig, the purchaser, or the Maynes, the sellers.

We think that these were the issues. They were submitted to the jury under instructions to which we find no timely and sustainable objections, and they were resolved in favor of the

plaintiffs. Likewise, we find no error in the rulings upon the evidence which are presented on this appeal.

*Judgment affirmed, with costs.*