# EASTERN ASSOCIATES, INCORPORATED *v.* SARUBIN

[No. 153, September Term, 1974.]

*Decided April 10, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Henry M. Decker, Jr.*, and *David K. Hayes* for appellant.

*Paul Levene*, with whom was *William J. Pittler* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

In accordance with Maryland Rule 871 a, we shall remand this case without affirmance or reversal for further proceedings. A trial judge (Grady, J.) determined that a broker, Eastern Associates, Incorporated (Eastern), which was paid a commission for procuring a tenant for a landlord, Morton T. Sarubin (Sarubin), was not entitled to commissions upon the rent paid under a renewal of the lease pursuant to an option in the lease exercised by the tenant.

Eastern and Sarubin entered into a standard listing contract on June 25, 1962, relative to a building owned by Sarubin in the 1300 block of St. Paul Street in Baltimore. The listing was for a period of three months on a printed form entitled "Standard Listing Contract," said to have been "[p]romulgated by the Real Estate Board of Greater Baltimore." By the terms of the contract Sarubin agreed to pay Eastern "an amount equal to the commission specified in the Standard Schedule of Rates of the Real Estate Board of Greater Baltimore ... if during the term of th[at] contract, or any extension thereof, said Realtor produce[d] a customer to *purchase rent* [sic] said property at the last *price/rental* agreed upon between the owner and the Realtor ...." (Emphasis in contract.) The contract recited that "[e]xcerpts from the Standard Schedule of Rates [were] shown on the reverse side of [the] contract." On the reverse side under "Rates for Procuring Tenants" appeared a sliding scale which began at six percent of "the average annual gross rental over the period of the lease" for the first year and went down to two percent per year after the fifth year. A further provision read:

"Lease Options: Where lease gives tenant an

option for an additional period and such option is exercised on the terms stated therein, or on any other terms, or where the tenancy is extended under a new lease, the commission shall be at the rates specified in section 3 (c) of this article (9)."

The reference to rates "specified in section 3 (c)" is to the rates to which we have just referred. No tenant was procured by Eastern before the listing agreement expired. However, Eastern continued in its efforts to find a prospective tenant. On October 28, 1963, Eastern brought this building to the attention of the then Director of the State Department of Budget and Procurement, suggesting it as a possible location for the Children's Division of the Department of Public Welfare of Baltimore City. On June 29, 1965, the State leased the building for the State Department of Public Welfare for the term of five years at $6,900 per month. The State was "given the option to renew the ... Lease for a further term of five (5) years ... subject to the same terms and conditions as in [that] Lease contained." The option was to be exercised "on or before the expiration of the fourth (4th) year next following the commencement date of [the] Lease."

David Greenberg (Greenberg) of Eastern testified that he attempted to persuade counsel for Sarubin to insert in the lease with the State a clause by which Sarubin would agree to pay to Eastern for that lease or any renewal thereof the real estate commissions in effect as of the date of the lease as described by the schedule of the Real Estate Board of Greater Baltimore. Later, he made a similar request of Sarubin, who refused. Greenberg said that Sarubin told him that he would be paid a renewal commission if the State exercised its option. The trial judge explicitly found that Sarubin made no such agreement. A bill in the amount of $16,560 was submitted by Eastern to Sarubin covering the broker's commission for the original five-year term. This was paid on July 9, 1965.

Sarubin has since sold the building. The State exercised its option to renew the lease subsequent to that sale.

Eastern sued Sarubin alleging in its second amended

declaration that Eastern was a licensed real estate broker employed by Sarubin to find a tenant for the office building in question; that it procured such a tenant; that a written lease was entered into between Sarubin and the tenant "for an original term of five years commencing December 4, 1965, and providing for an option to tenant to renew said lease for an additional term of five years, subject to termination by tenant, however, on one year's notice"; that Sarubin paid Eastern "the usual and customary real estate commission, based upon the original five-year term of said lease; that, pursuant to the provisions of said lease, tenant renewed the same for an additional term of five years . . . ; that, by reason of such renewal, [Eastern] ha[d] earned and ha[d] become entitled to the usual and customary commission in the amount of $1,656.00 based upon the first year of said renewal term beginning December 1, 1970," which Sarubin had "failed and refused to pay"; and that since the renewal Eastern had "become entitled to additional commissions in the amount of $3,312.00 based on the second and third years of said renewal term commencing December 1, 1971, and December 1, 1972, respectively, but [Sarubin] ha[d] failed and refused to pay same."

The matter came on for trial in the Superior Court of Baltimore City. Greenberg, by then president of Eastern, testified that he entered the real estate business in 1962, having been licensed as a real estate salesman on April 13 of that year. He said he obtained a license as a broker on May 1, 1964. In response to a question from his attorney as to what "the usual and customary real estate commissions were in the City of Baltimore in June of 1965 for the leasing of a property such as the property located at 1315 Saint Paul Street," Greenberg testified as to the schedule printed on the back of Eastern's contract, to which reference has already been made, based on the schedule published by the Real Estate Board. Melvin Greenwald, a real estate broker "[s]ince the very early '60's," described by Eastern in its brief as "an experienced real estate broker specializing in commercial and industrial real estate," said that "during the period from the beginning of [his] real estate career until

1965" he was involved in "perhaps fifty or a hundred" transactions in which he had "occasion to lease, or serve as a broker in the listing of commercial and industrial property." Greenwald testified that the usual and customary commissions of real estate brokers in Baltimore for the leasing of commercial property, such as that here in question, were the rates to which we have previously made reference. In response to a question from the court, he testified that the "recommended procedure and the custom at the time" was that if there were no written listing agreement between the owner and the real estate agent and the agent obtained a lease for the owner the prevailing custom would provide for rates as previously mentioned for an extension of the original lease.

Sarubin testified that when they "really knew that the State meant business," he desired to "know exactly what exposure [he] would have from all viewpoints, architecturally, commissions, real estate commissions . . . and also construction," as a result of which he asked Greenberg precisely what compensation he expected. The record at that point is:

> "And he said, 'I worked hard and for three years' and all, this sort of business, I said, 'I appreciate that. However, in this particular instance this was a wrap up. This is where the State picked up the telephone and said we want the building, let's find the deal. There was no sales job here.' So we finally agreed upon a figure that worked out to be $16,500.00 and whatever dollars odd change it was. There was no mention made of renewal commissions. I never in my history paid a renewal commission and I don't propose to start."

The trial judge made two findings of fact, stating:

> "Without reviewing the details of all of the testimony, the court finds that the following facts have been proven by the preponderance of the evidence:
>
> (1) The Standard Listing Contract of June

25, 1962, expired by its own terms three months after its execution. Consequently, the renewal provision in that contract was not in force on June 29, 1965, when the property in question was leased to the State of Maryland.

(2) At no time preceding the execution of the lease to the State on June 21, 1965, did the defendant expressly agree, either in writing or orally, to pay any renewal commission to the plaintiff." [1]

Eastern relied in the trial court and here relies upon what is now Maryland Code (1974) § 14-105 of the Real Property Article, and which at the time of trial was Code (1957, 1973 Repl. Vol.) Art. 21, § 14-105, being at the time of trial unchanged from the language appearing in Code (1957) Art. 2, § 17, effective at the time of the lease. It then read:

"Whenever, in the absence of special agreement to the contrary, a real estate broker employed to sell, buy, lease or otherwise negotiate real or leasehold estates or mortgages, or loans thereon, procures in good faith a purchaser, seller, lessor or lessee, mortgagor or mortgagee, borrower or lender, as the lease [case] may be, and the person so procured is accepted as such by the employer, and enters into a valid, binding and enforceable written contract of sale, purchase, lease, mortgage, loan or other contract, as the case may be, in terms acceptable to the employer, and such contract is accepted by the employer and signed by him, the broker shall be deemed to have earned the customary or agreed commission, as the case may be, whether or not the contract entered into be actually into [in] effect, unless the performance of such contract be prevented, hindered or delayed by any act of the broker."

---

**1.** The statement in the second finding of fact referring to June 21 is as reported. Obviously, June 29 was meant, the date of the lease.

The language in then § 17 was unchanged from its original enactment by Chapter 178 of the Acts of 1910. Slight stylistic changes were made when the Real Property Article was enacted in 1974.

In entering a judgment in favor of Sarubin for costs, the trial judge relied upon decisions in *Griffith v. Seco Company*, 410 S.W.2d 691 (Mo. App. 1966); *Mullen & Woods v. 615 West 57th Street*, 146 Misc. 599, 262 N.Y.S. 467 (Sup. Ct., App. T., 1st Dep't. 1933); and *Allwin Realty Co. v. Barth*, 161 A.D. 568, 146 N.Y.S. 960 (Sup. Ct., App. Div., 1st Dep't. 1914); together with language appearing in 12 Am.Jur.2d *Brokers* § 237 (1964), and an annotation in 79 A.L.R.2d 1063 (1961). The statement appearing in 12 Am.Jur.2d is:

> "The right of a broker who procured a tenant for a lessor to recover a commission on a renewal, extension, or renegotiation of the lease, where the arrangements were made directly between the lessor and lessee, ordinarily depends on the presence of contractual provisions for commissions in such a case. Even where such a provision was included in a brokerage agreement, a broker has been denied commissions where a lessor and lessee, without reference to the renewal or extension provisions of the original lease, made a new lease agreement whose terms differed from those of the renewal option provisions, particularly in respect of the time for which it was to run. A contrary result, however, has been reached in some cases." *Id.* at 979.

The quotation by the trial judge from Am.Jur.2d was limited to the first sentence. Cited as authority in Am.Jur.2d for that sentence are *Dooly v. Embry-Riddle Co.*, 2 Fla. Supp. 172 (Cir. Ct. Dade Co., Civil App. 1952), and *Cotter v. Naomi*, 127 So. 2d 573 (La. App., 3d Cir. 1961).

In *Dooly* a tenant, previously procured by a broker, renewed a lease for office space. The broker then sued the owner to recover a commission on this renewal. As stated by the court, his "theory was that by contract plaintiff would be

entitled to a commission for procuring tenants and also (on a reduced basis) entitled to a commission for any renewals which the tenants might make by election (even though the broker had nothing to do with the renewal)." The defendant "contended that the contract with the broker did not so provide, and that a provision to that effect added to the contract later was without any consideration, and, therefore, that the agreement for commissions on renewals was without consideration, and it was also contended that there was no renewal because the tenant insisted upon giving up some of the space, and on getting some new or different space." The broker did not negotiate the extension or renewal. As the court put it, "[h]is claim to a commission on the 'renewal' [was] based on a contract provision for the broker to become entitled to a commission automatically if such a tenant (given by lease the right to extend or renew on election) renew[ed] its lease, even without the broker having anything to do with the renewal." The court saw no substance in the defense relative to consideration. It held that "to the extent and degree to which there was a renewal or extension of the original lease, by continued occupancy of the same space covered by the first lease, and according to the same terms, without substantial or material changes in terms, the broker would be entitled to recover fractionally or proportionately." It further held that "it was error . . . to strike the pleas which defended on the ground that before they would renew or as a condition of extension or renewal the tenant . . . returned part of their rented space . . . and acquired other and different space of more value . . . and caused a change to be made in the total rental to be paid . . .," because the "pleas disclosed that to some degree the lease was not a renewal of the original lease, but that in part the new arrangement or 'lease' was the result of a negotiation between the owner and the tenant for something different from that which the tenant had or enjoyed under the original lease."

In *Cotter* a building owner, about to be called into the military service, retained a broker to represent him. Through that broker a lease was negotiated for a term of

five years beginning May 1, 1945. The lease contained an option to renew for a further term of five years expiring April 30, 1955. Although the lease was renewed pursuant to that option, the owner on December 1, 1950, without the aid of the broker, re-negotiated the lease for a term of 173 months from December 1, 1950. The latter agreement provided that landlord and tenant "agree[d] and stipulate[d] that [it] supersede[d] and replace[d] the lease between the parties dated February 17, 1945 which ha[d] been extended; and that said former lease [was] of no force and effect." The rent was paid through the broker up through April 30, 1955. He deducted his commissions from the monthly rentals as paid. The broker brought suit for commissions accruing subsequent to that date, "contend[ing] that it was the intention of himself and [the landlord] that he be paid a commission on the rental received from the leased premises as long as Franklin Stores Corporation remained a tenant of defendant; that this intent was manifested in the original lease agreement which created the agency." The court said:

> "This Court is of the opinion that it is not important in arriving at a decision in this case to determine whether the agreement of December 1, 1955 [sic], is a renewal of the original lease made in 1945, or whether it is a new lease, for the reason that under the terms of the original lease, plaintiff was to receive a stipulated commission for a period not to exceed ten years. Defendant has complied with his agreement, for he has paid plaintiff his commission for the five-year period named in the primary term of the original lease and the five-year renewal period in said lease. If this Court were to hold otherwise, it would mean that defendant would never be relieved of his obligation to pay plaintiff commissions on the leased premises leased by Franklin Stores Corporation as long as it remained in the premises, even though plaintiff had not secured the lease for a portion of the time that Franklin occupied the premises as lessee, as was done in the case at bar." *Id.* 127 So. 2d at 576.

The statement appearing in 79 A.L.R.2d is:

"In most cases it has been held that a broker who procured a lease for the lessor and who claims commission on a renewal thereof must recover, if at all, on the basis of an express contractual provision for commission on renewals. And, even where such provision was included in a brokerage agreement, most courts have held that the broker was not entitled to commission where lessor and lessee, without reference to the renewal or extension provisions of the original lease, make a new lease agreement which differs in its terms from those of the renewal option provisions, and particularly so in respect of the term for which it is to run." *Id.* at 1063.

Cases cited for this proposition include *Collom v. Roos Bros.*, 25 Cal. App. 73, 142 P. 858 (1st App. Dist. 1914); *Dooly; Plumbing Industry Program v. Good*, 120 So. 2d 639, 79 A.L.R.2d 1060 (Fla. App., 3d Dist. 1960); *Cotter; Griffith; Comly v. First Camden Nat. Bank & Trust Co.*, 22 N.J. Misc. 123, 36 A. 2d 591 (Sup. Ct. 1944); *Allwin; Brown, Wheelock, etc., Co. v. One Park Ave. Corp.*, 134 Misc. 313, 235 N.Y.S. 297 (Mun. Ct., Borough of Manhattan, 3d Dist. 1929); *Mullen & Woods v. 615 West 57th Street*, 146 Misc. 599, 262 N.Y.S. 467 (Sup. Ct., App. T., 1st Dep't 1933); *Mitchnik v. Brennan*, 159 Misc. 287, 286 N.Y.S. 609 (Mun. Ct., Borough of Queens, 5th Dist. 1936); *William Adam Schulz & Co. v. Realty Associates*, 17 N.Y.S.2d 924 (Mun. Ct., Borough of Queens, 2d Dist. 1940); *Spivak v. Madison-54th Realty Co.*, 60 Misc. 2d 483, 303 N.Y.S.2d 128 (Sup. Ct., Tr. T., Kings Co. 1969); and *M. J. Harris Co. v. Buckeye Sheriff Street Realty Co.*, 35 Ohio L. Abst. 373, 40 N.E.2d 949 (Ohio App., Cuyahoga Co. 1941).

In *Collom* a judgment for a complaining broker was reversed. A lease involved an option to a tenant to renew for seven years at the end of a three-year term and a provision, assented to by the lessor, that part of the monthly rentals were to be paid to the broker as commission. Suit was

against the tenant. The original lessee had split into two corporations with the lease transferred to the new corporation. The owner had been notified that the lessee would not exercise its renewal privilege. There had been an agreement between lessor and lessee for a new term. The court said that those facts did not sustain the broker's case in the absence of an affirmative showing that the setting up of the new corporation to which the lease was transferred, the termination of the old, and the making of a new lease, instead of continuing the old by exercising the renewal privilege, were all parts of a fraudulent design on the part of the tenant to avoid its obligations. It further pointed out that the new lease, on its face and standing by itself, could not be considered a renewal of the old since it was for a different term and made to a different lessee.

In *Plumbing Industry Program* a broker brought together a landlord and a tenant for a three-year lease. Prior to execution of the lease the landlord executed a memorandum in which he agreed to pay the broker for negotiating the lease "brokerage commission in accordance with the schedule of rates of the Miami Board of Realtors, upon signing of lease," with the further provision that "[s]hould [the] lessee, successors or assigns, exercise its option to renew or extend said lease on the same and/or additional space" there should be due from the landlord to the broker "an additional commission in accordance with the schedule of rates of the Miami Board of Realtors upon Lessee, successors or assigns, exercising said option to renew or extend said lease." The lease was for a three-year term. An option was granted to the tenant to renew for an additional term of two years before November 30, 1957. On December 15, 1957, prior to the expiration of the original lease, the landlord and tenant entered into a new lease for five years. It provided for the cancellation of the unexpired term under the original lease. It included the space covered by the original lease plus additional area, with new obligations upon the landlord. The court held it was "compelled to agree with [the] contention" of the landlord that "because the lease was not renewed, but cancelled, and a new lease was

executed covering a different time period, the option was never exercised and therefore no commission [was] due."

In *Comly* a broker procured a tenant. The lease between landlord and tenant, not executed by the broker, contained a provision by which the landlord agreed with the broker that the broker should be and remain the agent for the landlord and the leased premises "so long as said Lessee [was] a tenant under th[at] lease, or any renewal thereof, or any new lease contracted within one year from the expiration [t]hereof." A further lease contained similar language. A third lease did not. During the term of the third lease the landlord conveyed the property to the First Camden National Bank & Trust Company. That corporation executed a fourth lease with no provision in it relative to commissions to the broker. It was held that the period of the broker's agency had expired and he thus was unable to collect.

In *Griffith*, relied upon by the trial judge, the landlord promised to pay, "[i]n the event that [the] property [was] leased, [a] leasing commission [of] three per cent on the total amount of the lease." The court concluded that this applied only to the initial term, and not to a renewal. It said that it had "found no case which holds that a real estate agent is entitled to recover commissions on a re-newal or extension of a lease, absent an express provision in the brokerage agreement for same," citing the anno-tation in 79 A.L.R.2d. Of the case before it, it said that "respondent secured a lease under which the lessee was bound for a term of only five years. It was paid a com-mission for that service, and [was] not entitled to further compensation."

In *Allwin*, also relied upon by the trial judge, a broker procured a tenant for a term from August 1, 1904, to May 1, 1911. There was an option to the tenant to renew for a further term of seven years to expire May 1, 1918. Commissions were paid for the initial term. The tenant refused to renew under the option. A new lease was executed. The court said that "[i]f the new lease was not the result of any services performed by the [broker] and for which the [broker] should be entitled to recover a commission, [the broker could] not recover."

In *Brown* there was a short-term lease (two months) with provision for renewal for one year. It was renewed for one year. The tenant remained in possession for two years thereafter, pursuant to subsequent renewals. The plaintiff alleged that the brokerage agreement fixed a certain commission for procuring a tenant, part of which was to be paid at the time of the execution of the lease "and the balance when and in [the] event the option or options contained in the lease" were exercised. The court held that when the tenant exercised the renewal right prior to or simultaneously with the execution of the lease, he used up his renewal privilege; that the original lease and the first renewal alone were within the scope of the brokerage agreement; and that if further leases were agreed upon between landlord and tenant, the complaining broker would not be entitled to commissions by reason of his employment contract pursuant to which the first lease was obtained.

The facts in *Mullen,* another case relied upon by the trial judge, are gleaned from the opinion of the trial court appearing in *Mullen & Woods v. 615 West 57th Street,* 144 Misc. 697, 259 N.Y.S. 250 (Mun. Ct., Borough of Manhattan, 3d Dist. 1932). The premises in question were leased in 1928 to a tenant procured by the broker for a term expiring May 1, 1931. The lease contained an option to the tenant to renew for an additional term of 10 years by giving notice prior to January 1, 1931. Notice for the extension was given, but the lease was extended for the term of five years, rather than the ten permitted in the original lease. The broker presented testimony to the effect that prior to the consummation of the original lease an oral promise was made to pay the commission on the extended term when the option contained in the lease was exercised and a new lease signed. The landlord contended that since the promise, if made, could not have been performed within one year, it was unenforceable by reason of the New York statute of frauds. The trial court agreed with this defense but then went on to permit recovery on a *quantum meruit.* It was held on appeal in a per curiam opinion:

"Although we are in accord with the conclusion of

the trial court that the defendant's alleged promise to pay additional commissions was within the statute of frauds, and therefore unenforceable, we do not agree that there was an implied contract to pay such additional commissions in the event that the tenant exercised its option to renew the lease.

"In the absence of special agreement, the plaintiff would not be entitled to commissions on subsequent extensions of which it was not the procuring cause. Nor could the plaintiff recover on the theory that by securing the inclusion of the renewal clause in the original lease it performed services which were of benefit to the defendant. On the contrary, by assenting to the clause which gave the tenant the option of renewal, the defendant subjected itself to a liability without corresponding benefit. Indeed, the plaintiff made no attempt to prove that its services in procuring such an option in the original lease were of any value to the defendant, and it is manifest that it could not do so." *Id.* at 262 N.Y.S. 467-68.

In *Mitchnik* a lease contained a provision that the broker should receive commissions for the original term and each renewal thereof. The tenant, prior to the termination of the first term, gave notice that he could no longer remain as a tenant. Ultimately, he did remain as a tenant from month to month. The court said that "it [was] conceded that the broker did nothing to induce the tenant to remain in occupation." The court found "that there was not a 'renewal' of the original lease . . . and that the tenant remained in the property not as the result of the plaintiff's efforts to procure a tenant." Accordingly, judgment was entered in favor of the landlord. The court further said:

"To sustain an action for a broker's commissions on a renewal rental there must be proof (1) of a special agreement between the broker and the lessor, Mullen & Woods, Inc., v. 615 West 57th Street, Inc., supra; (2) compliance with section 31,

Personal Property Law [(N. Y. statute of frauds)], Allwin Realty Co. v. Barth, supra; (3) that the renewal was for the same term and rent, Tracy v. Albany Exchange Co., [7 N.Y. 472, 57 Am. Dec. 538 (1852)]; (4) in the event of failure to prove, (3) there must be proof that the new lease was the result of services performed by the broker and for which he should be entitled to recover, Allwin Realty Co. v. Barth, supra." *Id.* 286 N.Y.S. 613.

In *Schulz* a tenant failed to exercise his option to renew. He and the landlord entered into a new lease after the expiration of the original lease. The broker who procured the original lease did not participate in the later negotiations. The broker sued for commissions on rent paid under the new agreement. In denying recovery the court quoted that part of *Mitchnik* we have just quoted and then said:

"Plaintiff herein does not allege a special agreement with the defendants to pay additional commissions upon either a renewal of the old lease or the execution of a new lease, but relies solely upon the option clause of the old lease. A proper construction of the language and intention thereof affords no implication to pay plaintiff any commission. It is manifest that the plaintiff made no attempt to procure the making of the new lease or that its services were of any value insofar as the tenant remained upon the premises after November 1, 1939. Mullen & Woods, Inc. v. 615 West 57th Street, Inc., supra." *Id.* at 17 N.Y.S.2d 926.

In *Spivak* a broker sought to recover a commission allegedly due upon a tenant's exercise of an option to renew its lease. No mention of the brokerage agreement was made in the lease. The building was acquired by one of the defendants from the original lessor. The original lessee had assigned to another corporation. As the court put it, the parties "differ[ed] sharply on whether the [new] tenant . . . was in actual possession during the renewal period following

June 30, 1966," since the plaintiff "claim[ed] that the new corporate tenant was in fact the same tenant under a new name." The plaintiff asserted that commissions became due immediately at such time as the tenant exercised its option to renew, despite the absence of any reference in the lease to the brokerage agreement. The defendants, though denying any knowledge of the agreement, said that if they were aware of its existence, the agreement was purely a personal one, was unrecorded, did not run with the land, and was not one to which the defendants were privy. The brokerage agreement specifically required possession on the part of the tenant to entitle the broker to earn his initial commission. The court said it then followed "that continued possession on the part of the tenant could similarly constitute a condition precedent to her recovery of commissions on the renewal." Under the peculiar circumstances of this case this was found to be waived and the court said that "[t]he question remain[ed] whether the defendants, thus estopped from asserting lack of tenant's possession, m[ight] nevertheless prevail upon their claim of lack of privity of contract," with the broker relying "on defendants' knowledge of her claim as vitiating the legal necessity for privity." The court held that "mere knowledge by an assignee [was] meaningless in the situation at bar and, even if the defendants had knowledge of the existence of the brokerage agreement long prior to the exercise of the option, say at the very time they took the assignment of the lease, they would not be liable under the lease for the brokerage commission inasmuch as they did not undertake to perform that obligation." The court considered the question as to whether the broker might be a third party beneficiary of the leasing agreement. It was found that since the broker had taken no steps to see that the broker's interest was protected in the leasing agreement the broker could not "in fairness, complain of defendants' claimed machinations to avoid the additional commissions." Accordingly, judgment was against the broker.

In *Buckeye* the agreement between landlord and broker provided that commissions were to be paid for procurement of a five-year lease with further commission if an option for

an additional five years were executed. The claim of the broker was for commissions for rent paid after the original lease expired. It contained a renewal option. The option was not exercised, but prior to the expiration of the original lease a new one-year lease was entered into between landlord and tenant. It contained a renewal option for four years. This one-year lease was followed by additional leases, one for one year at the same rental with a renewal option for three years and another for one year at the same rental with a renewal option for four successive terms of one year each. The court said that if the tenant had exercised the option of renewal for another five-year term, then the commissions stipulated for that contingency would have been payable to the broker. It further held, however, that the broker was not entitled to a second commission unless the tenant remained in possession for a full term of five years or had obligated itself to remain a tenant for that period. It pointed out that the broker was not entitled to a second commission, since at the time the broker's action was filed the parties had executed two renewal leases by which the tenant had obligated itself to remain a tenant for no more than one year from the effective date of such leases, a total of seven years from the beginning of the first term. It said that the broker, entitled to commissions only on a five-year renewal which was to follow a five-year term of initial lease, could not claim anything at that time, but at the most could have tried to bring up his claim when the successive renewals, as arranged between landlord and tenant, might possibly have been interpreted to come within the terms of the original renewal option as an election to renew for another five years.

All of those cases are factually different from this case. It will be seen that in not one of them was there an attempt to recover upon the basis of customary commission except for *Spivak*. The brokerage agreement in *Spivak* called for commissions at the customary rate "as approved by the New York Real Estate Board." *Spivak* is factually inapposite.

It was the position of Eastern in the trial court and is its position here that under the Maryland statute it is "deemed

to have earned the customary ... commission" upon the execution of the lease since there was no express agreement in existence relative to its commissions. It is further its position that this customary commission included not only the commission for the initial term of the lease, but a commission upon the specified rent once the lease was renewed, notwithstanding the fact that the broker had nothing to do with the renewal. It adopts this position based upon the fact that the renewal option was specified in the original lease.

This case admittedly is one of first impression in Maryland. No case from without the State involving precisely the same point has been cited to us by counsel nor has our research disclosed such a case. So far as we have been able to determine a statute similar to the Maryland statute does not exist in other jurisdictions. The basis for compensation in other states in the absence of express contract, however, seems to be similar to that expressed in our statute. *See, e.g.,* 12 Am.Jur.2d *op. cit.* § 161, and 12 C.J.S. *Brokers* § 78 at 170-71 (1938). In *Riggs v. Turnbull,* 105 Md. 135, 66 A. 13 (1907), decided prior to the enactment of the statute in question, Judge Pearce, in a characteristically well-written opinion, reviewed the Maryland cases. The Court there held that Maryland law differed from the law in most states in that a broker was not entitled to a commission unless the transaction was consummated. It said that the Maryland rule was in accord with that prevailing in England. In *Brown v. Hogan,* 138 Md. 257, 268-69, 113 A. 756 (1921), Chief Judge Boyd observed for the Court that this statute "was passed to settle the question so often raised, as to when, in the absence of a special agreement, the broker was entitled to commissions." To like effect see *Wyand v. Patterson Agency,* 271 Md. 617, 623, 319 A. 2d 308 (1974); *Ricker v. Abrams,* 263 Md. 509, 517, 283 A. 2d 583 (1971); *Sanders v. Devereux,* 231 Md. 224, 231, 189 A. 2d 604 (1963); and *Schapiro v. Chapin,* 159 Md. 418, 424-25, 151 A. 44 (1930).

We conclude that the question for determination in this case becomes whether the landlord became bound to the

broker for customary commissions under the implied contract created by the statute and, if so, the amount of the customary commissions.

Sarubin urges that since he sold the property in question prior to the renewal of the lease that under the holding in *Hickman v. American Realty*, 277 A. 2d 688 (Super. Ct., New Castle Co., Del. 1971) he has no further liability. That case is not apposite. A broker there procured a tenant. The lease contained an option to the tenant to purchase at $110,000. The lessor was to pay a six percent broker's fee on exercise of the option. In addition, as the court put it, "the plaintiff . . . was entitled to a commission of one month's rent which was payable by the defendant during the term of the lease and in any 'extension or renewal thereof.'" The tenant desired to extend the lease for an additional year. The landowner desired to sell and suggested to the tenant that it exercise its option. It did not do so. With the consent of the landowner it became a holdover tenant from month to month. A sale was later agreed upon between landlord and tenant at $70,000. The broker then sued the lessor contending that it was entitled to a commission of six percent of the $70,000 sale price and a sum equal to one month's rent. The nisi prius court there involved held the broker not entitled to his six percent brokerage fee on the sale price. The trial judge did say, however, that "[s]ince the lease contemplated a renewal for one year, the broker [was] entitled only to $3/12$ of a month's rent because the landlord-tenant relationship between American Realty and Hemco, which began on April 1, 1969, terminated with the formation of the sales contract on June 25, 1969."

We dismiss this contention of Sarubin because the sale by the landowner would not alter the basic contract between the landowner and the broker. The presence of the option undoubtedly would have a direct bearing on the price at which the landowner might sell. We are not unmindful of the fact that a renewal option is not necessarily a benefit to a landowner. Taxes have increased. If the landowner is to continue to protect his investment, he must increase his insurance coverage, fire and casualty, thereby requiring a greater outlay of cash. Since the inflationary spiral probably

would dictate an increase in the overall value of the landowner's building, it follows that if there is no increase in rent he will be receiving a return on his investment at a lesser rate than at the time the lease originally became effective. Accordingly, it is questionable as to whether any real value accrued to the landlord by the provision of the renewal option in his lease, a clause binding him but only binding the tenant if the tenant elected to take advantage of it.

With this background, we turn to an examination of the Maryland law relative to customary commissions. Citing *Blake v. Stump*, 73 Md. 160, 20 A. 788 (1890), 12 Am.Jur.2d *Brokers* § 157 (1964), states:

> "A broker's compensation is ordinarily a commission on the price or value of the thing sold or exchanged, with his right thereto dependent upon the terms of his employment contract and the performance of the service contracted for. If the terms of his employment are silent upon the matter, so long as the services sued for were rendered at the request of the defendant, he is entitled to reasonable compensation. To entitle him to any remuneration, however, there must be an actual employment, express or implied, and the service contracted for must be rendered. Any ambiguity in a broker's contract with respect to his right to commission will, where he prepared the contract, be resolved against him.

> "A broker who seeks to make his right to commissions depend upon usage or custom must show that the usage or custom is so notorious as to affect his principal with knowledge of it and raise the presumption that such principal dealt with reference to it, or he must show that his principal had actual knowledge of it." *Id.* at 896.

Similarly, also citing *Blake*, 21 Am.Jur.2d *Customs and Usages* § 17 (1965), states:

> "It has frequently been stated that a custom or usage, to be valid and effective, must be actually

known, generally known, or notorious. So, before a person can be bound by an alleged custom or usage, he must either have actual knowledge of it or have assented to it, or the custom or usage must be one so general that he will be presumed to have knowledge of it. Or, as some courts have said, before a person can be chargeable with a custom or usage, the practice in question must be so notorious as to affect him with knowledge of it and to raise the presumption that he dealt with reference to it, or he must be shown to have had actual knowledge of it." *Id.* at 692.

In *Blake* our predecessors dealt with the question of what was the customary commission in Baltimore City for the sale of a house "for $15,000, subject to a ground rent of $1,020, redeemable at any time after one year at six per cent. . . . ." Blake had sold to Fowler, apparently without the services of a broker. Fowler desired to buy and he apparently had made inquiry of the broker as to who usually paid the broker. Upon being advised that the seller usually paid the commissions, Fowler directed the broker to make inquiry of Blake as to the price at which Blake would sell. This was done. Blake, the seller, advised the broker that he would sell for $40,000, but the broker reported to the buyer that he thought the property could be procured at $30,000. Such an offer was then made in writing to Blake. The sale was consummated at what amounted to a price of $32,000 when the ground rent was considered. In the suit for commissions it was established that a rule of the Real Estate Exchange provided that commissions should be chargeable on the entire principal or value of the property if any part of the purchase money remained on mortgage or redeemable ground rent. Our predecessors held that the trial court erred in rejecting a prayer which specified that if the jury found that the defendant had agreed to pay the plaintiff's commissions on the sale of the property "then their verdict must be only for commissions on $15,000, for which amount the leasehold interest in said property was sold," saying:

"It is very certain that the rules of the Brokers'

Exchange cannot be allowed to control. *Taliaferro v. Bank*, 71 Md. 218. It is a question of public and notorious usage, and whether such usage was reasonable and proper. If there was evidence that the appellant contracted to pay according to that rule, he would be bound by that contract. But there is no pretence there was an express contract on the subject. To bind the defendant to any such rule it must appear to have been of such public notoriety that he must be presumed to have knowledge of it, and therefore dealt expecting to be bound by it. A usage cannot be sustained which violates any well-known rule of law. *Raisin v. Clark*, 41 Md. 158; neither can it be sustained if it is unreasonable in its character. Mechem on Agency, 182. In *Livezy v. Miller*, 61 Md. 338, commissions on the actual money value exclusive of the mortgage, were allowed by this court, and no more. In respect to the rate of compensation for such service, it is said in Mechem on Agency, sec. 963, that in the absence of agreement, a prevailing usage will control; but in note I to same section, p. 792, 'to establish such custom, it must be reasonable, certain, uniform, continued, and, moreover, generally understood and acquiesced in by persons engaged in buying and selling * * *. A usage which is to govern a question of right should be so certain, uniform and notorious as probably to be known to, and understood by, the parties as entering into their contract.' " *Id.* at 171.

In *Groscup v. Downey*, 105 Md. 273, 65 A. 930 (1907), a broker sought to hold the owner of a leasehold liable for commissions based on the amount produced by the sale of the entire fee simple estate upon the ground of the existence of a custom to that effect in the City of Baltimore. The Court held that a prayer based upon such a combined selling price should not have been granted because it did "not require the jury to find the existence of such a custom, as we think it should have done." Our predecessors further said, after citing *Blake* and its holding:

"As the plaintiff's prayer did not instruct the jury to allow him compensation upon a *quantum meruit*, but relied upon usage and custom to fix the amount to which he was entitled, it should have required the jury to find the existence of a custom, regulating the compensation of agents making sales like the one before us, of the uniform and notorious character required by law to cause it to enter into and become a part of all contracts made within the sphere of its operation. The prayer assumes the existence of such a custom." *Id.* at 279.

Although both *Blake* and *Groscup* were decided prior to the enactment of the present statute in 1910, the requirement for proving the customary commission was in no wise changed by that act.

In *Weinberg v. Desser,* 243 Md. 347, 221 A. 2d 66 (1966), relied upon by Eastern, the jury had been instructed, as it was put by Judge Horney for the Court:

" 'You can, if you desire, adopt a measure of damages along the standards * * * [set forth in the schedule of commissions adopted by the local real estate board]. But you [do not] have to. * * *. You [also] have a right to consider what was the fair and reasonable value of these services. Usually we have a written contract and we know what the fee schedules are going to be. You [do not] have that here. If [you find that a principal and agent] relationship existed, * * * then, it is an implied contract. * * *. Evidence was introduced * * * that * * * the fee schedule * * * is just a minimum schedule, but * * * there * * * [are] circumstances * * * [when] there would be a charge less than * * * the minimum or they would charge more. * * *. [You] can accept that testimony and consider it. But the court further charges you that you are not necessarily bound to it. You have the right in this case * * * to find an amount which you would deem to be [a] fair and reasonable value of the services performed.' " *Id.* at 353.

The Court said:

"Regardless of whether the instructions as far as they went were proper or improper, it is clear that the jury was not fully informed as to the law of the case. Since the jury found that brokerage commissions had been earned, the plaintiffs, in the absence of an agreement as to compensation, were entitled to customary commissions or reasonable remuneration. If there is an established custom in the locality with respect to the amount of compensation to which a broker is entitled, the law implies a promise on the part of the employer to pay the usual or customary commissions, and if no such usage or custom can be shown, a broker is entitled to the reasonable value of his services. See 12 Am.Jur.2d *Brokers* § 161 (1964). To that end, the plaintiffs should have been permitted to introduce evidence to show, if they could, that the schedule of commissions adopted by the local real estate board was the customary charge for the services they had performed for the defendants, and, if there was any proof to that effect, the jury should have been instructed accordingly. See *Mayne v. Eig*, 215 Md. 270, 137 A. 2d 557 (1958)." *Id.* at 357.

We regard the law here applicable as well summed up in F. Gross, *The Law of Real Estate Brokers* (1917):

"§ **211.** * * *

A custom or usage, when it is reasonable, uniform, well settled and not contradictory to fixed rules of law or the express terms of the agreement, is generally deemed to form a part of the contract. . . . A custom, to bind the parties, must either be known to them or must be so general that they must be supposed to have contracted with reference to it. . . . A custom may be established by presumptive as well as by direct evidence. . . . Rules of real estate boards are binding upon members but not upon nonmem-

bers unless such rules are established as a custom. . . . *Id.* at 222.

* * *

"§ 222. When Custom Binds the Parties.

'A custom or usage which binds the parties to a contract does so only upon the principle either that they have knowledge of its existence or that it is so general that they must be supposed to have contracted with reference to it.'" (Citing *Harris v. Tumbridge*, 83 N. Y. 92, 100 (1880)). *Id.* at 230.

The trial judge made an express finding here that Sarubin did not, prior to the execution of the lease, "expressly agree, either in writing or orally, to pay any renewal commission to [Eastern]." Eastern has proven what the Baltimore Real Estate Board schedule might require. It has presented some evidence upon the custom in the community through the testimony of its own president and that of another broker who apparently had been involved in a limited number of transactions prior to this lease. No finding of fact was made by the trial judge as to whether he was persuaded by this evidence that the Baltimore Real Estate Board schedule was indeed the custom. Likewise, there is no finding as to whether the rule of that board was "of such public notoriety that [Sarubin] must be presumed to have knowledge of it, and therefore dealt expecting to be bound by it." It is true that the original contract here referred to that rule, but it is also true that Sarubin, admittedly experienced in real estate matters, testified that he "kn[e]w of no broker [who could] honestly say that most of his business [was] done as per any rate sheet"; that when Sarubin talked with Greenberg to agree on commissions, when the parties "really knew that the State meant business," that they "finally agreed upon a figure that worked out to be $16,500.00 and whatever dollars odd change it was," with "no mention made of renewal commissions" (as found by the trial judge); that Sarubin said he "never in [his] history [had] paid a renewal

commission and [he did not] propose to start"; and that Sarubin claimed he "saw stars" when Greenberg approached Sarubin's attorney in November or December, 1966, relative to inserting into Sarubin's contract for sale of the building a provision relative to commissions on renewal. The "stars" thus seen led Sarubin, according to his testimony, to inquire of Greenberg "[w]hat right [he] ha[d] to go to [Sarubin's] attorney and ask him to do something without even discussing it with [Sarubin]," claiming that no one knew anything about any such commission and that "it looked like a shakedown to [Sarubin]." Sarubin claimed that as a result of this incident he ordered Greenberg removed from Sarubin's building.

We conclude that for the broker to recover here it will be necessary for him to establish to the satisfaction of the trier of fact that the customary commission due from a landowner to a broker for procurement of a lease in Baltimore City includes a commission upon a subsequent renewal of the lease under an option to renew contained in the lease, notwithstanding the fact that the renewal was in no wise. procured by or induced by the broker. He must further establish that the parties had knowledge of this custom or that it was so uniform and notorious that they must be supposed to have contracted with reference to it. The broker's burden as plaintiff includes the further obligation to establish the amount of commissions due under any such custom, if there is in fact such a custom. Upon the remand the trial judge will be obliged to make findings of fact addressed to these subjects.

> *Case remanded without affirmance or reversal for further proceedings consistent with this opinion; costs to abide the final result.*